United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 95-4136
_____

United States of America,              *
                                        *
        Plaintiff - Appellee,           *
                                        *
    v.                                  *
                                        *
Thomas Ervin Payne,                     *
                                            *
        Defendant - Appellant.          *
                                        *
                                        *

        _____                                 Appeals from the
United

        States District Court for the
            No. 95-4195                          Eastern District of
Missouri.
        _____


United States of America,              *
                                        *
        Plaintiff - Appellee,           *
                                        *
    v.                                  *
                                        *
Christopher Foster,                     *
                                            *
        Defendant - Appellant.          *
                                        *


                        _____

Submitted: January 16, 1997
Filed: July 10, 1997

_____

Before LOKEN, JOHN R. GIBSON, and MORRIS S. ARNOLD, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

A jury convicted Christopher Foster and Thomas Ervin Payne of conspiracy to distribute and possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Foster appeals arguing that: (1) the district court[1] erred in denying his motion to suppress evidence seized without a warrant; (2) there was no probable cause for his warrantless arrest or for the seizure of his bag; (3) he did not voluntarily consent to the search of his residences; (4) the district court erred in admitting into evidence the testimony of a government-paid informant; (5) the district court erred in limiting the time allowed for closing argument; and (6) the district court erred in finding him responsible for the distribution of more than twenty kilograms of cocaine. Payne also appeals, arguing that the district court erred: (1) in not suppressing evidence seized from his automobile and hotel room; (2) in proceeding on his indictment when the government unnecessarily delayed presenting the charge to the grand jury in violation of Federal Rule of Criminal Procedure 48(b); (3) in denying his motion to sever his trial from Foster's trial; and (4) by enhancing his sentence for being a leader of a criminal activity that involved five or more participants. Payne also asserts that the government violated his due process rights because the government knowingly introduced and failed to correct perjurious testimony from government witnesses. We affirm.

_____

[1]The Honorable George F. Gunn, United States District Judge for the Eastern District of Missouri.

Foster first came under investigation when he met with Carlos Garavito, a government-paid informant, on December 9, 1993 to discuss money laundering. Law enforcement agents conducted surveillance of the meeting, and continued doing so after the meeting. Foster never gave Garavito any money to launder.

On December 15, 1993, law enforcement agents followed Foster from his home to a hotel near the Los Angeles airport where he picked up a man later identified as David Woods. Foster and Woods drove to a car repair shop, which Foster entered. After Foster left the shop, Woods and Foster got into a second car and sat in it for a short time. Foster then got out of the car and Woods drove away in it. Law enforcement agents stopped Woods and he consented to a search of the car, which was registered to Nicole Tait. The search of Woods's car revealed an empty secret compartment in the trunk. A narcotic trained dog positively alerted to the secret compartment in the trunk, indicating the compartment had a narcotic odor.

On January 11, 1994, law enforcement agents saw Foster place a box out with the trash for curbside collection. After Foster left, a law enforcement agent removed the box and took it to the Azusa Police Department where a trained police dog indicated the box had a narcotic odor at its bottom.

On February 15, 1994 law enforcement agents followed Foster to a condominium complex. An agent testified before the magistrate that Foster engaged in counter-surveillance driving on his way to the condominium complex. Upon arriving at the complex, Foster took an empty green soft-sided suitcase from the trunk of his car and carried it into the complex. Foster left the building a short time later without the green suitcase and drove to a nearby restaurant where a man later identified as Thomas Payne met him. Foster left his car at the restaurant and drove back to the complex with Payne in Payne's red Thunderbird.

Upon arrival at the complex, Foster got out of the car and walked to a nearby gate. Another man came to the gate and handed Foster a green soft-sided suitcase. The suitcase now appeared to be heavy based upon the manner in which the men carried the suitcase. Foster walked back to the trunk of the car where Payne met him. Payne took the suitcase from Foster and placed it in the trunk. Payne then departed in the Thunderbird, while Foster remained at the complex.

Law enforcement agents followed Payne onto the freeway and eventually stopped Payne's car. Officers searched the car and seized the green suitcase, which contained approximately twenty kilograms of cocaine. After arresting Payne law enforcement agents searched his hotel room, but no evidence seized from the hotel room was introduced at trial.

After Payne's arrest, agents continued surveillance on Foster. On February 17, 1994, two days after Payne's arrest, agents saw Foster leave his residence with a duffle bag that he placed in the trunk of his car. Agents followed him for a short time, then stopped him and asked for permission to search his car. Before the actual search, Foster told agents that the money in his trunk was his, and not money from narcotic transactions. A search indicated that the duffle bag contained $360,180. Agents then took Foster to the Santa Monica Police Station, where he signed consent forms for the search of his car and his residences. The agents found $19,333, a money counter, and certain documents during the search of Foster's residence on Ocean Avenue.

Several others were also involved in the conspiracy. Raymond Tohill served as a courier under Payne's direction. Payne also directed Marvin Bonds in some aspects of this conspiracy. Leroy Eason testified at trial that he loaned Payne $40,000, and that he made four trips to Los Angeles during which he obtained a total of forty-six kilograms of cocaine.

Foster and Payne filed pretrial motions to suppress. After a hearing, the magistrate judge filed a Report and Recommendations, that the district court adopted, denying the motions to suppress and Payne's motion to sever his trial. A jury convicted Payne and Foster of conspiracy to distribute and possession with intent to distribute cocaine. The district court sentenced Payne to 324 months of imprisonment and Foster to 300 months of imprisonment. The district court's ruling denying the motions to suppress and motion to sever, as well as issues related to the trial and the sentencing hearing, are challenged in this appeal.

**I.**

Foster first argues that the district court erred in its conclusion that Foster did not have standing to challenge either the search of the car driven by Woods, or the search and seizure of the suitcase found in Payne's car. We review factual determinations related to a standing issue under a clearly erroneous standard, but review de novo the district court's determination to deny a motion to suppress. See United States v. Gomez, 16 F.3d 254, 256 (8th Cir. 1994).

A defendant can argue for the suppression of evidence gathered in violation of the Fourth Amendment "only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." United States v. Padilla, 508 U.S. 77, 81 (1993) (per curiam). Foster has the burden to show that he had a legitimate expectation of privacy in the car driven by Woods and in the suitcase seized from Payne's trunk. See Gomez, 16 F.3d at 256. If Foster does not prove a sufficiently close connection to Woods's car or the suitcase in Payne's trunk, then he has no standing to argue that the police searched or seized the items illegally. See id. We previously have held that factors relevant to the determination of standing include:

> ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the

> totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

Id. (citing United States v. Sanchez, 943 F.2d 110, 113 (1st Cir. 1991)).

There is no coconspirator exception to the standing rule. See Padilla, 508 U.S. at 82. Foster himself must satisfy the test we laid out in Gomez for each search.

Here, Foster did no more than sit in a car outside an auto repair shop in which Woods later drove away. Foster does not assert ownership of the car. Indeed, the car was registered to Nicole Tait. Further, Foster presented no evidence that indicated he had ever possessed the car or had driven it. That Foster sat in the car with Woods for a short time before Woods drove it away, does not convince us that the district court was clearly erroneous in its factual determination that Foster had not established possession or control of the car. The district court did not err in adopting the magistrate's recommendation that Foster had no legitimate expectation of privacy in the car driven by Woods and therefore that Foster has no standing to challenge the search of the vehicle driven by Woods. See Gomez, 16 F.3d at 256.

Similarly, the district court did not err in holding that Foster had no legitimate expectation of privacy in the suitcase found in Payne's car. The district court found that Foster only possessed the bag for a short time until he turned the suitcase over to someone at the condominium complex. Later, Foster retrieved the suitcase, and immediately gave it to Payne, who then drove away with it.

Foster presented no evidence that he owned the suitcase, had historical use of the suitcase, or had the ability to regulate access to the suitcase, as the suitcase was only zipped shut and had no lock. Finally, no evidence in the record indicates that the suitcase had any type of identification tags indicating that the suitcase belonged to

-6-

Foster. Foster's temporary possession of the suitcase does not satisfy the Gomez factors, and the district court did not err in holding that Foster does not have standing to challenge the search and seizure of the suitcase.

## II.

Payne and Foster each argue that the district court erred in not suppressing evidence found in their cars. We first address Payne's arguments. Payne argues that the district court erred in finding that he consented to the search of his car, and in the alternative that if he did so, his prior illegal arrest vitiated his consent. Finally, Payne argues that even if his arrest was not illegal, his assumed consent was not voluntary.

Police may search a car without a warrant if they have probable cause to believe that the car contains contraband or evidence. See Chambers v. Maroney, 399 U.S. 42, 51 (1970); Carroll v. United States, 267 U.S. 132, 155-56 (1925). In such circumstances, the police may search every part of the car and its contents that may conceal the object of the search. See California v. Acevedo, 500 U.S. 565, 573-76 (1991); United States v. Ross, 456 U.S. 798, 825 (1982). If probable cause exists to believe a container in the trunk of a car contains contraband, the container may be searched without a warrant. See Acevedo, 500 U.S. at 573-76.

The district court accepted the magistrate's conclusion that because law enforcement agents had probable cause to believe the suitcase in Payne's Thunderbird contained contraband, the agents were entitled to stop the car and search the suitcase. Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243-44 n.13 (1983). Probable cause to search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 116 S. Ct. 1657, 1661 (1996). We must consider the events leading up to the search and then decide whether

these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or probable cause. See id. at 1661-62. We make an independent de novo review of the ultimate question of probable cause to make a warrantless search. See id. at 1663. We review for clear error, however, findings of historical fact and give "due weight to inferences drawn from those facts" by local law enforcement officers. See id.

Immediately before stopping Payne, law enforcement agents had observed Foster take a green suitcase into a condominium complex, which appeared to be empty based on the manner in which Foster carried it. Foster then drove to a restaurant where Payne met him, and the two drove back to the condominium complex. Foster then got out of the car and walked over to a gate where a man handed Foster the suitcase which now appeared to be heavy, based upon the manner in which Foster carried it. Foster placed the suitcase in the trunk of Payne's car and Payne drove away.

Before this transaction, law enforcement agents had long been surveilling Foster. The information known to the agents was that: (1) Foster previously had explored money laundering; (2) Foster had been seen in the company of Woods, who the agents previously had found driving a car with a hidden compartment in the trunk to which a narcotics trained dog positively had alerted for the presence of a narcotic odor; (3) the agents had seized an abandoned box from Foster's trash to which a narcotics trained dog had alerted to the presence of a narcotic odor; and (4) on February 15, 1994 the agents had observed Foster using what they believed to be counter-surveillance driving techniques on his way to the condominium complex.

Viewing the totality of the circumstances through the eyes of an experienced narcotics agent, we conclude that probable cause existed for the agents to believe that the suitcase Foster put in Payne's trunk contained contraband or evidence. Cf. United States v. Piaget, 915 F.2d 138, 139-40 (5th Cir. 1990) (per curiam) (probable cause to stop and search defendant's car existed where a man with a history of drug dealing

transferred bag to defendant's car). Because the agents had probable cause to search the suitcase in Payne's trunk, we do not need to consider whether Payne consented to the search or if he did so consent, whether his consent was vitiated by his illegal arrest.

Foster argues that there was no probable cause for his warrantless arrest or for the seizure of his bag from the trunk of his car that occurred on February 17, 1994. This stop of Foster followed law enforcement agents' observation of Foster placing a heavy duffle bag in the trunk of his car. We hold that the officers had probable cause to believe the duffle bag in Foster's car contained contraband or evidence. We so conclude based on all of the factors supporting probable cause for the stop of Payne's car, plus the seizure of twenty kilograms of cocaine from a suitcase Foster handed to Payne just moments before agents seized it, and the agents' observation of Foster with this duffle bag that he had placed in his trunk. As noted above, probable cause only requires "a probability or substantial chance of criminal activity, not an actual showing of such activity." Gates, 462 U.S. at 243-44 n.13. Here, based on the totality of the circumstances, agents had more than enough reason to believe that the duffle bag Foster placed in his trunk contained evidence or contraband, and therefore the officers were entitled to search the bag. See Acevedo, 500 U.S. at 573-76.

Because we hold that the agents had probable cause to search the duffle bag, we do not need to reach Foster's arguments that he did not voluntarily consent to the search of his bag, or that he was illegally arrested, because no fruit was obtained from this seizure. The only evidence obtained from the stop was the duffle bag that the officers had probable cause to believe contained evidence or contraband.

**III.**

Foster next argues, contrary to the finding of the magistrate judge that the district court adopted, that he did not voluntarily consent to the search of his residences. We review for clear error a finding of voluntariness. See United States v. White, 42 F.3d

457, 459 (8th Cir. 1994). Foster argues that because agents interrogated him in violation of Miranda v. Arizona, 384 U.S. 436 (1966), the evidence obtained through his consent during the interrogation must be suppressed.

We have never held that a request to search must be preceded by Miranda warnings, or that a lack of Miranda warnings invalidates a consent to search. See United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (consent to search was voluntary even though defendant had been illegally detained and law enforcement officer had failed to give Miranda warnings), cert. denied, 115 S. Ct. 2015 (1995); cf. United States v. Washington, 957 F.2d 559, 563 (8th Cir.) (rejecting defendant's argument that agents should have given him a Miranda warning before being asked for permission to search), cert. denied, 506 U.S. 883 (1992). In Schneckloth v. Bustamonte, 412 U.S. 218 (1973), the Supreme Court discussed the Miranda decision stating that "the basis for decision was the need to protect the fairness of the trial itself. . . . There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment." Id. at 240-41. In short, Miranda rights affect the integrity of the truth finding process in a criminal trial, but Fourth Amendment rights go to the right of privacy and to be left alone. See United States v. Ritter, 752 F.2d 435, 438 (9th Cir. 1985). As the purposes of the two protections are different, it would be unreasonable to require Miranda warnings before a request for permission to search. See United States v. Hall, 565 F.2d 917, 920-21 (5th Cir. 1978). Instead, the fact that Miranda warnings were not given will simply be a factor to consider under the voluntariness test. See id. at 921.

In Schneckloth the Supreme Court held that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." 412 U.S. at 227. In United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990), we observed that courts should ask whether the person who consented:

(1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Id. at 381 (citations omitted).

The magistrate assessed the voluntariness of the consent under the totality of the circumstances, applying the Chaidez factors, and made the following factual findings. Agents stopped Foster at 12:08 p.m. Foster was at the scene of the stop for approximately forty to fifty-five minutes and it took approximately ten to fifteen minutes to transport Foster to the police station. Two detectives questioned Foster when he arrived at the station. Foster signed the consent forms at 1:21 p.m. Officers explained Foster's rights to him, and gave him a chance to review the forms that made clear that he had a constitutional right to refuse to permit the searches. Further, the magistrate made a particular factual finding that "[n]o threats or promises were made to induce [Foster] to sign the consent forms." During the interview officers allowed Foster to go to the rest room and gave him drinking water. One of the officers conducting the interview estimated that the interview was ninety minutes long, but other officers indicated that from the time of the stop of Foster's car, to the presentation of the consent forms, only ninety minutes elapsed. After Foster signed the consent forms, officers advised him of his Miranda rights. The magistrate judge concluded that though the court did not "condone the officers' failure to give defendant Foster his Miranda warnings," it did "not appear that the defendant's will was in any way overborne." We see nothing clearly erroneous with this conclusion and thus affirm the district court's finding that Foster voluntarily consented to the search of his residences.

## IV.

Payne next argues that the government violated his Fifth Amendment rights because the government knowingly introduced and failed to correct the perjurious testimony of Marvin Bonds.  Payne failed to raise this issue before the district court, so we review only for plain error.  See United States v. Jenkins, 78 F.3d 1283, 1288 (8th Cir. 1996).  Payne alleges that Bonds perjured himself when he testified that he received the $40,000 from Payne that authorities seized from Bonds when he was arrested in Green River, Utah, and when Bonds testified that the quarter kilogram of cocaine found in his home was payment he received from Payne.

In order to prove prosecutorial use of false testimony, Payne must establish that: (1) the prosection used perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a reasonable likelihood that the perjured testimony could have affected the jury's judgment.  See United States v. Martin, 59 F.3d 767, 770 (8th Cir. 1995).

Payne argues that Bonds perjured himself because arrest records in the Green River, Utah area demonstrate that authorities never arrested Bonds in that area, and because a government agent testified before a grand jury that Bonds had bought the cocaine that authorities found in his house during a search.  There is no reasonable likelihood that Bond's testimony on these issues would have affected the jury's judgment in light of the minor significance these facts had on the overwhelming amount of evidence against Payne and therefore the district court did not plainly err.

## V.

Foster argues that the district court erred in admitting the testimony of Carlos Garavito, a paid informant, regarding a December 1993 meeting between Garavito and Foster where they discussed money laundering. Foster contends that this testimony

-12-

illustrated that Garavito had ties to Columbia and that the government used this testimony to enlarge the size of the conspiracy from Columbia to St. Louis.

We review evidentiary rulings for an abuse of discretion. See United States v. Hamell, 931 F.2d 466, 469 (8th Cir.), cert. denied, 502 U.S. 928 (1991). We will not reverse a conviction on the basis of an erroneous evidentiary ruling where the error is harmless. See United States v. Byler, 98 F.3d 391, 394 (8th Cir. 1996). We give deference to a district court's decision under the Rule 403 balancing test and reverse only for a clear abuse of discretion. See United States v. Rabins, 63 F.3d 721, 726 (8th Cir. 1995), cert. denied, 116 S. Ct. 1031 (1996). Unfair prejudice "speaks to the capacity of some concededly relevant evidence to lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 117 S. Ct. 644, 650 (1997). The critical issue is the degree of unfairness of the prejudicial evidence and whether it tends to support a decision on an improper basis.

Here, Foster concedes that the "evidence may be tangentially relevant," but argues that it was substantially more prejudicial than probative of the indicted charge, and that therefore the district court abused its discretion in admitting the evidence. As Foster concedes that the evidence may be relevant, we look for the prejudicial effect of Garavito's testimony. Foster argues Garavito's testimony was more prejudicial than probative because the government used the testimony to enlarge the size of the conspiracy from Columbia to St. Louis which inflamed the jury. Nothing indicates that Garavito's testimony lured the fact finder into declaring guilt on the fact that the drug conspiracy stretched from Columbia to St. Louis instead of from California to St. Louis. See Old Chief, 117 S. Ct. at 650. Garavito was only one of several witnesses presented by the government. The emphasis placed on his testimony and the size of the conspiracy issue, in light of the entire trial, was minimal. There was no unfair prejudicial effect of Garavito's testimony. The trial court has broad discretion in determining whether the probative value of Garavito's testimony outweighed the unfair

prejudice.  See Ravins, 63 F.3d at 726.  We cannot say the district court abused its discretion in admitting this evidence.

## VI.

Foster argues that the district court erred in finding him responsible for the distribution of more than twenty kilograms of cocaine. We review the district court's determination of a drug quantity for clear error.  See 18 U.S.C. § 3742(e) (1994); United States v. Escobar, 50 F.3d 1414, 1424 (8th Cir. 1995).  A defendant may be held responsible only for "drug quantities implicated in the conspiracy that are reasonably foreseeable to [her or him]."  United States v. Montanye, 996 F.2d 190, 192 (8th Cir. 1993) (en banc), cert. denied, 117 S. Ct. 318 (1996).  We observe that the amount of drugs attributed to the entire conspiracy is not automatically attributable to each defendant.  See United States v. North, 900 F.2d 131, 133 (8th Cir. 1990).

Our review of the evidence indicates that authorities seized twenty kilograms of cocaine shortly after its distribution from Foster to Payne. In addition, Leroy Eason testified that he obtained forty-six kilograms of cocaine from Foster on the four trips he made to Los Angeles while he was a member of this conspiracy.  During the sentencing hearing, the district court considered Eason's credibility in light of the reduced sentence Eason received for his testimony, and specifically noted that the jury had reason to credit Eason's testimony.  We see no clear error in the acceptance of this testimony.  Thus, the cocaine seized in the green suitcase and Eason's trial testimony alone show Foster's responsibility for sixty-six kilograms of cocaine, a greater amount than the district court attributed to him, and therefore there is no need for us to consider other references to additional amounts of cocaine.  We cannot say the district court clearly erred in holding Foster responsible for more than twenty kilograms of cocaine.

## VII.

Payne argues that the district court erred in giving him a four-level enhancement for being the leader of criminal activity that involved five or more participants under United States Sentencing Guideline section 3B1.1(a). Though slightly unclear from his brief, he challenges the finding that more than five people participated in this conspiracy, or that he directed five participants in this conspiracy.

We review for clear error the district court's factual determinations made in consideration of this sentencing enhancement. See 18 U.S.C. § 3742(e); United States v. Harry, 960 F.2d 51, 53 (8th Cir. 1992). We review de novo, however, the district court's application of a section of the sentencing guidelines to a particular case. See United States v. McFarlane, 64 F.3d 1235, 1237 (8th Cir. 1995).

Section 3B1.1(a) provides for a four-level upward adjustment of the offense level in cases in which "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (1995). Application note 1 of the commentary to section 3B1.1 defines the term "participant" as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."

First, Payne himself was a participant. See U.S.S.G. § 3B1.1, comment. (n.1); Harry, 960 F.2d at 53. Payne concedes in his brief that he was involved in the conspiracy with Foster, that he "directed Tohill" in his role as a courier, and that he "directed Bonds in certain respects of the conspiracy." Payne argues, however, that the government presented no evidence showing that Payne had any control over Bentley, Eason, or Woods. Indeed, Payne argues that there was no trial testimony whatsoever that he directed either Bentley or Woods, and that not only did he not direct Eason, but that Eason's "role in the conspiracy appears to have been more of a 'joint venturer' than as a mere participant."

-15-

Payne's argument that he did not have control over Bentley, Eason, or Woods, however, misses the point. In this circuit, a four-level upward adjustment applies where the evidence shows a defendant is a leader or organizer of an illegal enterprise that involved five or more participants even if the defendant's leadership role did not encompass all the participants. See United States v. Smith, 49 F.3d 362, 367 (8th Cir.), cert. denied, 115 S. Ct. 2009 (1995). As Payne has conceded that he organized Bonds and Tohill, we look only to see if this illegal enterprise involved five or more participants. As already stated, Payne, Foster, Bonds, and Tohill were involved in the conspiracy. In addition, Payne's brief concedes that Eason was involved in the conspiracy, but argues that he was more of a joint venturer, rather than a mere participant. The guidelines, however, define a participant as one "who is criminally responsible for the commission of the offense" and make no mention of a role labeled as a joint venturer. Eason's testimony indicates he was involved in the same conspiracy with Foster, Payne, and the others. Thus, the district court did not err in finding Payne was a leader or organizer in this conspiracy, and that the conspiracy involved at least five participants. Accordingly, we affirm the four-level upward adjustment.

## VIII.

Payne and Foster raise numerous other arguments. Payne argues that the district court erred in refusing to sever his trial from that of Foster's. The government indicted Foster and Payne for joint activities that were fully supported by the evidence. While the government presented some evidence of Foster's interest in money laundering that did not apply to Payne, Foster was not charged with this offense, and the government did not emphasize the money laundering evidence at trial. Payne also argues that the district court erred in not suppressing evidence seized from his hotel room, and that the district court should have dismissed the indictment against him under Federal Rule of Criminal Procedure 48(b). Foster argues that the district court erred in limiting the closing arguments to thirty minutes for each defendant in light of the extreme amount

of conflicting testimony.  We reject all these arguments, which are so lacking in merit that they do not justify detailed discussion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.