# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 99-2473MN, 99-2653MN, 99-2731MN, 99-2905MN

_____

|  |  |  |
|---|---|---|
| _____ | \* | |
| | \* | |
| No. 99-2473MN | \* | |
| _____ | \* | |
| | \* | |
| United States of America, | \* | |
| | \* | |
| Appellee, | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| | \* | |
| Arturo Bahena, also known as Hugo, | \* | |
| | \* | On Appeal from the United |
| Appellant. | \* | States District Court |
| | \* | for the District of |
| _____ | \* | Minnesota. |
| | \* | |
| No. 99-2653MN | \* | |
| _____ | \* | |
| | \* | |
| United States of America, | \* | |
| | \* | |
| Appellee, | \* | |
| | \* | |
| v. | \* | |
| | \* | |
| | \* | |
| Rodolfo Ibarra, also known as Rudy, | \* | |
| | \* | |
| Appellant. | \* | |

_____

No. 99-2731MN

_____

United States of America,

Appellee,

v.

Juan Villanueva Monroy,

Appellant,

_____

No. 99-2905MN

_____

United States of America,

Appellee,

v.

Alfredo Prieto, also known as Nasario
Sanchez-Barron, also known as Mudo,

Appellant.

*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*  On Appeal from the United
*  States District Court
*  for the District of
*  Minnesota.
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*
*

_____

Submitted:  March 13, 2000

Filed:   September 14, 2000

_____

-2-

Before RICHARD S. ARNOLD, BEAM, and MURPHY, Circuit Judges.
_____

RICHARD S. ARNOLD, Circuit Judge.

This is a drug case. Four defendants appeal their convictions for conspiracy involving methamphetamine. The defendants are Arturo Bahena, Rodolfo Ibarra, Alfredo Prieto, and Juan Villanueva Monroy. We affirm the convictions and the sentences.

## I. BACKGROUND

A brief overview of the case will be important for understanding the contentions of the various appellants. The case is about a drug organization that imported large quantities of methamphetamine from California to Minnesota between December of 1997 and June of 1998. The investigation began with Rodolfo Ibarra, who was obtaining methamphetamine from California for distribution in Minnesota. Ibarra's main distributor was Arturo Bahena. The latter was also purchasing drugs, and in a more significant amount, from Juan Villanueva Monroy and his brother, Jose Luis Villanueva. Gradually, Monroy and Villanueva became Bahena's major source. Monroy and Villanueva were assisted by Alfredo Prieto. Monroy's girlfriend, Diane Zuniga, was paid for receiving packages that were sent through the mail. Sonia Barber, a friend of Monroy, was also receiving drugs on his behalf. Diane Zuniga's cousin, Martina Zuniga, was recruited to receive packages of drugs for Monroy. Stephen Tiarks and Ms. Barber played much the same role. Another cousin of Diane Zuniga, Maria Avalos, was also recruited to receive packages of drugs. The ultimate source, or at least Monroy's and Villanueva's source, appears to have been two men known as Nana and Lucho, who lived in Mexico. Nana and Lucho have not been apprehended or prosecuted.

Police began to seize packages containing drugs that had been mailed to

Minnesota. Prieto decided that drugs were no longer going to be sent through the mail. Accordingly, it was decided that cars loaded with methamphetamine would be driven from California to Minnesota. In mid-May 1998, Mr. Tiarks agreed to drive a load of methamphetamine in his pickup truck. A large group, including Villanueva, Prieto, Monroy's nephew, Eduard Costillo, Tiarks, and Barber drove to California in two cars, Tiarks's pickup truck and a Suburban. On the way, the group left Villanueva at the Denver Airport, so he could fly ahead to California and get the load of methamphetamine ready. When the Colorado-Utah border was reached, the Suburban broke down. The trip continued in the pickup. When the group arrived in California, they learned that Villanueva had been arrested in Denver. Ultimately, Villanueva was sent back to Mexico. Tiarks, Barber, and others flew back to Minnesota, leaving the pickup truck in California to be loaded with methamphetamine. Prieto stayed in California to organize the shipment. Costillo stayed with him. There were difficulties in organizing the shipment. At one point or another, both Monroy and Bahena offered to go out to California to drive the load back to Minnesota. Monroy assured Bahena, who was anxious to get drugs, that he would get all of the drugs that came from California. Finally, on June 8, 1998, the first load, containing 15 pounds of methamphetamine, was sent to Monroy by Prieto. This load arrived in Minnesota on June 12, and all of it went to Bahena for distribution. The day before, June 11, Tiarks had flown out to California to drive the second load, containing 35 pounds of methamphetamine, back to Minnesota. On June 14, the pickup truck was loaded, and Tiarks left California. He was expected to arrive in Minnesota early on the morning of June 16. That morning, at about 8:00 a.m., law-enforcement officers, who were expecting the shipment, arrested Tiarks and seized 35 pounds of methamphetamine from the tailgate of his pickup truck. This was the largest single seizure of methamphetamine in the history of Minnesota. Monroy, Prieto, Costillo, Zuniga, and Ibarra, as well as others, were arrested.

By August of 1998, an indictment had been returned charging 16 defendants with conspiring to distribute methamphetamine, and to possess it with the intent to distribute,

in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). Before trial, 11 of these defendants, including Ibarra and Bahena, pleaded guilty. Two defendants were fugitives at the time of trial. Charges against one defendant were dismissed. Two defendants, Monroy and Prieto, pleaded not guilty and went to trial. They were both convicted by the jury.

## II.  ARTURO BAHENA

We discuss first the contentions made on appeal by defendant Arturo Bahena. This defendant was convicted on his plea of guilty to one count of conspiring to distribute methamphetamine, and to possess it with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). Bahena's arguments concern the length of the sentence imposed on him. He was sentenced to 320 months in prison, or, to put it more comprehensibly, 26 years and 8 months. This sentence was the consequence of the District Court's finding that Mr. Bahena's total offense level was 39. This finding, when combined with his Criminal History Category of I, produced an imprisonment range of 262 to 327 months.

Mr. Bahena contends that the District Court erred in imposing his sentence in two respects:  in setting the base offense level at 38 and in imposing a four-level enhancement for being the leader or organizer of a criminal activity involving five or more participants. (A base offense level of 38, plus the four-level enhancement for leadership in the offense, would produce a total offense level of 42, but this figure was reduced to 39 by the District Court's action in granting a three-level reduction for acceptance of responsibility.) The base offense level of 38 depends, in turn, on the weight of methamphetamine with which Mr. Bahena was involved. If the weight was more than 15 kilograms, as the District Court found, the total level of 39 is appropriate. Mr. Bahena contends that this finding was clearly erroneous, and that he should have been held responsible for the lesser amount of five to 15 kilograms. If this had been done, the base offense level would have declined to 36, and the total offense level,

assuming no other changes, would have been 37, producing a sentencing range of 188 to 235 months.

Our scope of review is limited. We may reverse only if we find the District Court's finding clearly erroneous, or, to put it another way, only if we have a definite and firm conviction that the District Court was mistaken. We have no such conviction. The key to this issue is the attribution to Mr. Bahena by the District Court of a shipment of methamphetamine containing 15.9 kilograms. If this shipment is properly chargeable to the defendant, no other issues of fact need to be looked at. Defendant would, on account of this incident alone, reach the over-15-kilogram level. The shipment in question was seized on June 16, 1998, shortly after arriving in Minnesota by car. It is conceded that Mr. Bahena knew the shipment in question was coming. Bahena Sentencing Transcript 27, 39. In fact, at one point he offered to go out to California and get it himself. Id. at 36-38, citing Government Exhibits (GX) 120A, p. 2; 124A. Bahena contends that, although he may have known of the shipment, he should not be charged with its entire contents, because the shipment was to be divided among him and other participants in the conspiracy. The District Court found to the contrary.

In a clear and comprehensive sentencing memorandum, the Court quoted a taped conversation between Mr. Bahena and a co-defendant. In this conversation, Mr. Bahena is told that "as soon as they get here . . . all of them are yours." Addendum for the Appellant Bahena A9. "They" and "them" in this statement refer to quantities of methamphetamine, including the 15.9-kilogram shipment under discussion. See GX 118A, p. 3; VII Trial Tr. 101-05. Other quotations from taped conversations support this finding. Defendant, quoting still other portions of taped transcripts, argues that, in context, the conversations were misinterpreted by the District Court. But how to interpret the various conversations is an issue of fact, and we are not persuaded that the District Court clearly erred, if indeed it erred at all. We hold that the Court permissibly found that Bahena was personally involved with at least 15 kilograms of

methamphetamine. This amount is therefore properly taken into account for sentencing purposes under U.S.S.G. § 1B1.3(a)(1)(A).

Mr. Bahena's other contention concerns the four-level enhancement for role in the offense. In their submissions to the District Court, both the defendant and the United States took the position that a three-level enhancement for being a manager or supervisor would be appropriate. The District Court, however, on the recommendation of the United States Probation Office, imposed a four-level enhancement for being a leader or organizer. See U.S.S.G. §§ 3B1.1(a), (b). The District Court reached this conclusion because, in its view, Mr. Bahena controlled the actions of two other defendants, his sister and his wife, supplied large quantities of drugs to two other co-defendants, was in complete control of the shipments of drugs that were destined for him, and was found with $113,000 sewn into the lining of his clothing when he was on his way to Mexico. Bahena Sent. Tr. 52.

We begin, necessarily, with the words of the relevant Guideline. The text reads as follows:

> Based upon the defendant's role in the offense, increase the offense level as follows:
>
> (a)    If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b)    If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c)    If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than

described in (a) or (b), increase by **2** levels.

In interpreting this provision, we have in mind the Sentencing Commission's Commentary, Application Notes 2 and 4, which read as follows:

2.   To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

4.   In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

Both Mr. Bahena and the United States agreed, in presentence submissions, that a three-level enhancement (manager or supervisor) would be appropriate. The

Probation Office, however, recommended in the Presentence Report (PSR) a four-level enhancement (leader or organizer), and, as we have seen, the District Court accepted this recommendation. On appeal, the defendant renews his contention in favor of a three-level enhancement, while the United States now adopts the four-level position taken by the District Court. We review the District Court's findings of historical fact (for example, whether Mr. Bahena controlled the actions of any other participants, and, if so, how many) under the clearly-erroneous standard. On issues of law (for example, what is the line between an organizer or leader, on the one hand, and a manager or supervisor, on the other), our review is de novo. See United States v. Payne, 119 F.3d 637, 646 (8th Cir.), cert. denied, 522 U.S. 987 (1997).[1]

Some propositions emerge fairly clearly. First, a defendant need be only "an" organizer or leader. He does not have to be "the" organizer or leader. There can be more than one organizer or leader of a criminal activity for purposes of § 3B1.1. Second, a defendant need not have organized or led all of the other participants in the activity. E.g., Payne, supra, 119 F.3d at 646. One's status as a distributor, standing alone, does not warrant the enhancement, see United States v. Bryson, 110 F.3d 575, 584 (8th Cir. 1997). The line between being an organizer or leader, on the one hand, and a manager or supervisor, on the other, is not always clear, United States v. Delpit, 94 F.3d 1134, 1155 (8th Cir. 1996), but we have said several times that this Court has "broadly defined" the terms "organizer" and "leader." E.g., United States v. Ortiz-

---

[1]The Supreme Court faced a comparable issue in Ornelas v. United States, 517 U.S. 690 (1996). There, the question presented was the standard of appellate review for trial-court determinations of reasonable suspicion and probable cause. With respect to historical facts, the Court said, the standard is whether a finding is clearly erroneous. The second part of the analysis, whether the facts permissibly found amount to reasonable suspicion or probable cause, "is a mixed question of law and fact . . .." Id. at 696. Such ultimate determinations receive "independent appellate review," id. at 697, but, still, "a reviewing court should take care . . . to give due weight to inferences drawn from . . . facts by resident judges." Id. at 699. Such "inferences . . . deserve deference." Ibid.

Martinez, 1 F.3d 662, 677 (8th Cir.), cert. denied, 510 U.S. 936 (1993), cited with approval in Delpit, supra, 94 F.3d at 1155.

We start with the facts which appear to be common ground between the parties. Defendant was a distributor of methamphetamine. He re-sold the drugs to smaller traffickers, at least two in number. He controlled or at least influenced the actions of his wife, Maria Angelica Mendez-Perez, and his sister, Karina Bahena. At his guilty-plea hearing, Bahena admitted that he had directed both his sister and his wife to distribute and deliver drugs to customers. Bahena Guilty Plea Hearing Tr. 18. While defendant was in Mexico, his wife continued to make deliveries and collect money for him. His sister stored drugs, money, and a gun for him. Both his wife and his sister are described in the Presentence Report, ¶¶ 59 and 60, as "average participant[s] in the offense." These paragraphs were not objected to. The District Court was within its rights in holding that defendant organized the activities of his wife and sister. He recruited them to join the conspiracy, and they continued to act on his behalf even when he was out of the country. Bahena was more than a mere distributor, passively receiving drugs from others and then re-selling them. He actively promoted the shipments from California and led or organized at least his two family members. He made a large amount of money. We hold that the District Court's characterization of Bahena as a leader or organizer was permissible. Its findings of fact are not clearly erroneous, and the Court committed no error of law. It is not disputed that the criminal activity involved five or more participants.

The sentence imposed on Mr. Bahena is affirmed.

### III.  ALFREDO PRIETO

The appellant Alfredo Prieto pleaded not guilty and went to trial. The jury found him guilty on Count I, conspiracy to distribute methamphetamine and to possess it with intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). The

District Court found a total offense level of 44 and a Criminal History Category of I. Accordingly, the Court imposed the mandatory sentence of life in prison.

On appeal, Mr. Prieto makes four contentions: that the District Court erred in denying his motion for a continuance to allow defendant additional time to obtain funding and produce English translations of transcripts of conversations used against him at trial; that the government committed a due-process violation when it failed to turn over, in a timely fashion, drafts of English translations of taped conversations that differed from the transcripts of translations ultimately used by the government at trial; that it was error to impose a four-level increase for being a leader or organizer in the offense; and that it was error to impose a two-level enhancement under U.S.S.G. § 2D1.1 for possession of a weapon.

Three of these arguments do not require much discussion. The District Court's findings as to the weapon enhancement are not clearly erroneous. They are supported by ample evidence, which we need not detail. Both contentions with respect to translations of taped Spanish conversations are without substance. Even if we assume that a continuance should have been granted, and that draft transcripts should have been turned over to the defense earlier than they were, any error was harmless, because it made no practical difference in the trial. Mr. Prieto has failed to point out to this Court any particular significant error in the translations as used by the government at trial, or any particular significant difference between the draft translations originally produced by the government and the transcripts ultimately offered in evidence. Defendant's Reply Brief mentions several particular passages in the translations as to which defendant claims prejudice, but none of these errors, if that is what they were, had anything to do with the verdict, as far as we can see.

The question of Mr. Prieto's role in the offense – whether a four-level increase should have been imposed on account of his being a leader or organizer of criminal activity involving five or more participants – deserves discussion. Defendant's position

-11-

is that he was a mere courier, and that no enhancement at all for his role in the offense should have been applied, not even an enhancement of two or three levels. Thus, Mr. Prieto's position differs from that taken by Mr. Bahena. The latter has conceded the propriety of a three-level enhancement, and contests only the additional level. Mr. Prieto, on the other hand, argues that no enhancement at all for role in the offense was appropriate.

As we have already noted, merely distributing drugs is not sufficient for such an enhancement. Someone does not become a manager, supervisor, leader, or organizer of a buyer merely by selling. Instead, a defendant must direct or enlist the aid of others. Mr. Prieto concedes, however, that Tiarks, the driver who brought the 15.9-kilogram "second shipment" to Minnesota from California, and Barber testified that Prieto instructed them on how to proceed after Monroy had been arrested. It may be, as appellant contends, Brief 35, that the District Court based its finding, at least in part, "on the testimony and statements of cooperating witnesses, who were looking to secure a reduction in their own sentences." Such matters of credibility, however, are for the trier of fact, and it is not within our province, in the normal case, to re-weigh them on appeal.

We are satisfied that there was ample evidence to show that Prieto supervised the activities of Tiarks and Barber. In addition, he threatened to kill Avalos and Zuniga if they could not show that they had not stolen drugs belonging to him. III transcript 65. Thus, at the very least, Prieto influenced the conduct of Avalos and Zuniga, or attempted to do so. He also supervised the conduct of Eduard Costillo, his nephew. GX 129A, p.14. On the basis of this and other evidence that we need not detail here, we hold that the District Court did not clearly err in its findings as to Prieto's activities, and that the conclusion that Prieto was a leader or organizer was not infected by any error of law. The contention that Mr. Prieto was a mere courier is simply not supported by the record.

## IV. RODOLFO IBARRA

Rodolfo Pilar Ibarra, the third appellant whose case is before us, was convicted on his plea of guilty to one count of conspiracy to distribute methamphetamine and to possess it with the intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). The District Court found the appropriate total offense level to be 31, and the Criminal History Category III. This combination produced an imprisonment range of 135 months to 168 months, and the Court imposed a sentence of 168 months (14 years). On appeal, the Guidelines computation is not in issue. Mr. Ibarra does, however, attack both his conviction and his sentence. He asserts that he did not knowingly and intelligently enter a plea of guilty because he did not fully understand the consequences of his action, no explanation in Spanish having been made to him. He also argues that he should have been allowed to withdraw his plea and go to trial before the jury. Finally, with respect to the sentence, Mr. Ibarra asserts that, as a deportable alien, the sentence has inflicted an exceptional hardship on him, and that, accordingly, the District Court should have departed downward under U.S.S.G. § 5K2.0. We reject all of these contentions and affirm both the conviction and the sentence of this defendant.

The arguments may be briefly addressed. Mr. Ibarra, after initially pleading not guilty, changed his plea to guilty on October 16, 1998. Later, after employing new counsel, he made a motion for withdrawal of the guilty plea under Fed. R. Crim. P. 32(e). The District Court denied the motion the next day, March 4, 1999. A motion for reconsideration was filed, and this motion was denied on April 5, 1999. On each occasion, the District Court filed an opinion explaining its action.

Defendant argues that he did not knowingly and voluntarily plead guilty. His first lawyer, he says, did not adequately explain the case to him. His lawyer did not speak Spanish, and no interpreter was present during attorney-client meetings. We do not find this position persuasive. The District Court found that defendant's plea was

knowing, intelligent, and voluntary, and these findings are not clearly erroneous. At the change-of-plea hearing, the defendant, after having been placed under oath, declared that he did understand the proceedings, that he was satisfied with his lawyer, and that he had committed the acts constituting the elements of the crimes alleged in the indictment. Defendant concedes that the plea agreement was translated and signed at the time of the change of plea. An interpreter was present in court, and defendant stated that he understood each paragraph of the plea agreement. Defendant's later conclusory claim that he did not understand what was going on rings hollow. We hold that the plea was knowing, voluntary, and intelligent, and that defendant has shown no "fair and just reason," Fed. R. Crim. P. 32(e), for withdrawing it. Our review of a district court's decision not to allow withdrawal of a guilty plea is for abuse of discretion only, and there has certainly been no such abuse here.

Defendant argues that his sentence should have been reduced because of his status as a deportable alien. This status, he says, will result in his being incarcerated under more severe conditions, perhaps being excluded from community-confinement programs or incarceration in minimum-security facilities. Accordingly, the argument goes, the District Court should have departed downward to compensate defendant, so to speak, for the exceptional hardship of his conditions of confinement.

The argument is difficult for us to follow, and we cannot agree with it. In the first place, the District Court was aware of its authority to depart, but simply declined to exercise it. The Court found that "defendant's status as a deportable alien has not resulted in unusual or exceptional hardships in his conditions of confinement to an extent sufficient to warrant a departure." Addendum for the Appellant Ibarra A16. Conviction of trafficking in a large amount of drugs, the Court held, makes it unlikely that defendant would have been placed in a minimum-security facility in any event. When a court recognizes it has the authority to depart, but declines to do so, its decision is generally not reviewable on appeal. See United States v. Fairchild, 189 F.3d 769, 780-81 (8th Cir. 1999). Even if the decision were reviewable, review would

-14-

be only for abuse of discretion, and we see nothing like that here. Defendant's status as a deportable alien is entirely attributable to his own voluntary acts. That he will suffer consequences as a result of that status is simply a fact. It need not alter the consequences that he is suffering on account of his drug offenses.

For these reasons, the defendant Ibarra's conviction and sentence are affirmed.

## V. JUAN VILLANUEVA MONROY

The last appellant whose case is before us is Juan Villanueva Monroy.[2] This defendant pleaded not guilty and went to trial, along with Mr. Prieto. He was convicted by the jury on one count of conspiring to distribute methamphetamine and to possess it with the intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). The Court fixed Mr. Monroy's base offense level at 38, on account of his responsibility for 55 kilograms of methamphetamine. This defendant was then given two enhancements: four levels for being a leader or organizer in the offense, and two levels for possession of a weapon in connection with the offense. The total offense level of 44, combined with a Criminal History Category of I, produced a mandatory sentence of life in prison. On appeal, Mr. Monroy attacks both his conviction and his sentence.

The government's case against Mr. Monroy was largely based on tape recordings

---

[2]At some points in the briefs, this appellant's name is given as Juan Monroy Villanueva. In most cases, however, including in his own brief, he is called Juan Villanueva Monroy. We therefore refer to him as Monroy. The confusion may derive form the custom in Hispanic countries of placing one's surname, or patronymic, immediately after the forename, with one's mother's maiden name coming last. On the other hand, Mr. Monroy's brother is referred to as Jose Villanueva. We are not certain what the correct designation is, but we consider it safe to refer to Mr. Monroy by the name used in his own brief.

of 57 wiretapped conversations. At trial, the government claimed that Mr. Monroy could be heard on 21 of the 57 calls. Sonia Barber and Diane Zuniga, both of whom know Mr. Monroy, testified that it was his voice on the calls. Most of these 21 phone calls involved preparations by Monroy and co-defendants to transport methamphetamine in a truck from California to Minnesota. Mr. Monroy attempted to introduce expert evidence, using a method called voice spectrography, to demonstrate that the voice on 16 of the 21 recordings was not his. Voice spectrography transforms acoustical signals produced by a speaker's voice into a visual display called a spectrogram. The spectrogram graphically displays the frequency, time, and amplitude of the speaker's voice. The examiner makes a visual comparison of the spectrogram as well as an aural comparison of the speech samples available.

The District Court held a hearing, pursuant to <u>Daubert v. Merrell Dow Pharmaceuticals Inc.</u>, 509 U.S. 579 (1993), to determine whether or not this evidence should be admitted. Following the hearing, the Court ruled from the bench that Mr. Monroy's proffered voice spectrography evidence was unreliable and could not be admitted under <u>Daubert</u>. Later, the Court issued a written opinion to that effect.

Mr. Monroy has five contentions on appeal. First, he argues that <u>Daubert</u> should apply only to civil proceedings, and not to criminal cases. Second, he argues that even if <u>Daubert</u> applies to criminal cases, the District Court misapplied it here. Third, he argues that the District Court erred in not granting his motion to suppress the wiretapped conversations. Fourth, he argues that the District Court erred when it enhanced his sentence for possessing a firearm, for having a leadership role, and for possessing more than 55 kilograms of methamphetamine. Finally, he argues that the District Court abused its discretion in denying his motion to depart from the sentencing guidelines based on his extraordinary family circumstances. We address each of these contentions in turn, beginning with the <u>Daubert</u> issues.

## A.

Daubert does apply to criminal cases.  As defendant concedes, our Court has used the Daubert standard on numerous occasions when either the government or the criminal defendant have tried to introduce expert testimony.  See United States v. Whitehead, 176 F.3d 1030 (8th Cir. 1999) (Daubert applied where government sought to introduce expert testimony concerning check-kiting techniques); United States v. Villiard, 186 F.3d 893 (8th Cir. 1999) (Daubert applied where defendant sought to introduce expert testimony concerning fallibility of eye-witness testimony).  In both civil and criminal cases, Daubert is the standard that the Supreme Court has given for testing the admissibility of scientific evidence under Fed. R. Evid. 702.  The Federal Rules of Evidence apply in both civil and criminal cases.  See Fed. R. Evid 1101(b) ("These rules apply . . . to criminal cases and proceedings . . ..").

## B.

Mr. Monroy next argues that the District Court misapplied Daubert.  We review the District Court's application of Daubert under an abuse-of-discretion standard. United States v. Rouse, 111 F.3d 561, 571 (8th Cir. 1997).  The District Court abused its discretion, Mr. Monroy contends, in not taking his Sixth Amendment right to compel witnesses in his defense into consideration.

The Supreme Court has held that evidentiary rules cannot be applied to criminal defendants asserting substantial Fifth or Sixth Amendment rights in exactly the same way as they are applied to other litigants.  In Rock v. Arkansas, 483 U.S. 44 (1987), the defendant tried to give hypnotically refreshed testimony.  The State of Arkansas had an evidentiary rule that excluded all such evidence.  The Court held that "[i]n applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify," id. at 56, and concluded that applying Arkansas's per se ban would impermissibly burden the

defendant's Fifth Amendment rights. Similarly, in Chambers v. Mississippi, 410 U.S. 284 (1973), the defendant challenged a state hearsay rule on the ground that it abridged his Sixth Amendment right to present witnesses in his own defense. The Court reversed the defendant's conviction, holding that when a state rule of evidence conflicts with the right to present witnesses, the rule "may not be applied mechanistically to defeat the ends of justice." Id. at 302.

Recently, the Supreme Court emphasized that rules established by state and federal rulemakers excluding evidence from criminal trials do not abridge a defendant's right to present a defense as long as they are not arbitrary or disproportionate to the purposes they are designed to serve. United States v. Scheffer, 523 U.S. 303, 308 (1998). The Daubert rule is not itself "arbitrary." To the contrary, Daubert gives district courts specific factors to consider in determining whether expert evidence is relevant and reliable. Also, Daubert serves the important purpose of allowing the judge to serve as a gatekeeper and screen out evidence that is unreliable and would have a tendency to confuse or mislead the jury.

The possibility remains that the application of the Daubert rule in any particular case could be disproportionate to its purpose, in the sense that it might unreasonably restrict the defendant's right to present evidence in his own defense. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers, 410 U.S. at 302. In this case, however, so far as we can tell, the Sixth Amendment argument was never made in the District Court, so it would be hard for us to fault that Court for not mentioning the defendant's right to present evidence as one of the factors in its Daubert analysis. We are left with the question whether the District Court abused its discretion in weighing the normal Daubert factors, including whether a theory or technique can be tested, whether the theory or technique has been subjected to peer review and publication, the known or potential rate of error in using the scientific technique in question, and whether the technique or theory has been generally accepted in the particular field. Daubert, 509 U.S. at 593-94. The District Court held

a fairly extensive <u>Daubert</u> hearing, and then followed up with a careful opinion explaining its reasoning.  We are not sure whether we would have made the same decision, but neither are we convinced that the District Court made a clear error of judgment in weighing the factors on the basis of the record before it.

We assume for present purposes that spectrographic voice analysis, as such, would not necessarily be inadmissible in every case.  Indeed, such evidence has been received in a number of cases.  See <u>United States v. Smith</u>, 869 F.2d 348 (7th Cir. 1989) (government introducing evidence); <u>United States v. Love</u>, 767 F.2d 1052 (4th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1081 (1986) (defendant introducing evidence); <u>United States v. Williams</u>, 583 F.2d 1194 (2d Cir. 1978), <u>cert. denied</u>, 439 U.S. 1117 (1979) (government introducing evidence); <u>United States v. Jenkins</u>, 525 F.2d 819 (6th Cir. 1975) (government introducing evidence).  In fact, the government's own expert witness in this case, Dr. Nakasone, has testified for the government that voice spectrography is reliable.  See <u>United States v. Smith</u>, 869 F.2d 348, 353-54 (7th Cir. 1989).

Certain particular factors in the case before us, however, support the District Court's conclusion.  As the Court remarked from the bench,

> I think Mister De Vir [the defendant's expert] was very honest and straightforward, and I think by doing so he has indicated that he is probably not qualified to testify in this case on the matters that have been set forth by the Defendant's counsel.

IV Tr. 185.  Mr. De Vir had no college degree.  He had no formal training in voice spectrography.  He could not say for certain when he first began in the field.  Many of the witness's answers to technical questions were vague.  He was not a member of any professional organization in the field, did not subscribe to any professional journals, was not familiar with the voice-comparison standards issued by the International

Association for Identification, and did not know how the tape that he used for comparison had been produced. He conceded that the method he used was not in accordance with the standards of the International Association for Identification. It is true, as defendant points out, that there are other organizations in the field, with other standards, but Mr. De Vir did not testify that the methods he used conformed to any recognized standards. According to Dr. Nakasone, the government's expert witness at the <u>Daubert</u> hearing, it is important, when comparisons are made, to use the original of the tape in question - here, tape recordings made of wiretapped conversations to which Mr. Monroy (according to the government's theory) was a party. That was not done: Mr. De Vir used copies, and the copies had been made at high speed, a circumstance which, again in Dr. Nakasone's view, could distort the quality of the voices.

The defendant makes some valid points. For example, the District Court accepted Dr. Nakasone's testimony that only "broadband" analysis, that is, analysis capable of recording frequencies above 5,000 hertz, is reliable. Mr. De Vir had used "narrowband" analysis. The record shows, however, that the human voice, as heard over the telephone, resonates at a frequency less than 4,000 hertz, so it seems that the narrowband spectrogram, which goes up to 5,000 hertz, should be sufficient.

When all of these factors, pro and con, are weighed together, we believe the District Court's decision was within permissible bounds. We are not holding that voice spectrography is never admissible. We hold only that the District Court's decision to exclude the testimony of this particular witness, on the record before it, was not an abuse of discretion.

C.

Mr. Monroy's <u>Daubert</u> contention is his most substantial point. The other arguments may be briefly disposed of. We hold that the District Court did not err in refusing to suppress the wiretapped conversations. The showings made by the

government in its application for permission to conduct wiretaps were, in our view, sufficiently detailed. The application explained why other methods of investigation were believed to be insufficient. See United States v. Milton, 153 F.3d 891, 895 (8th Cir. 1998), cert. denied, 525 U.S. 1165 (1999). The court's findings, at sentencing, with respect to the defendant's possession of a gun, his leadership role in the offense, and the quantity of drugs involved, were not clearly erroneous. Defendant argues that these findings were based solely on the uncorroborated testimony of cooperating government witnesses. Assuming that this is so, the fact remains that it is the job of the District Court, in the first instance, to assess the credibility of live witnesses. We find no clear error in the District Court's assessments of credibility in this case.

Finally, defendant argues that the District Court abused its discretion in denying his motion to depart below the Sentencing Guidelines on the basis of extraordinary family circumstances. Such circumstances are ordinarily not to be considered, U.S.S.G. § 5H1.6. Defendant contends that he was the sole or primary provider for his family, that he was raising his teenage sons by himself, and that, after his arrest, his sons were forced to return to Mexico to live with their mother, where "[t]heir living conditions are quite desperate." Brief for Appellant Monroy 58. The facts are appealing, but the law constrains us to agree with the government that they do not warrant a reversal of the District Court's denial of Mr. Monroy's motion for downward departure. The District Court was aware of its authority to depart on the basis of extraordinary family circumstances, but simply decided in its discretion not to do so. In such a case, the District Court's decision is virtually unreviewable. See United States v. Fairchild, 189 F.3d 769, 780-81 (8th Cir. 1999). Further, the District Court did not abuse its discretion. Serious crime often has lamentable consequences, and not for the defendant only. The circumstances of this case do not seem to us sufficiently extraordinary to take it out of the "heartland" of cases, in which consideration of family circumstances is out of bounds.

VI.

The judgments in each case are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.