**UNITED STATES of America, Appellee,**

v.

**Richard A. WRIGHT, Appellant.**

**No. 91–3309WM.**

United States Court of Appeals, Eighth Circuit.

Submitted June 11, 1992.

Decided Aug. 4, 1992.

___

Bruce R. Anderson, Kansas City, Mo., argued, for appellant.

D. Michael Green of Kansas City, Mo., argued (Jean Paul Bradshaw II and D. Michael Green, on the brief), for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HEANEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Richard A. Wright appeals his conviction for conspiracy to possess with intent to distribute cocaine. Wright challenges the district court's [1] refusal to suppress statements and evidence obtained from him during the police investigation. We find that the statements made by Wright were voluntary, and that the evidence seized was obtained during a consensual search. We therefore affirm.

I.

The facts are undisputed. Kansas City police on November 30, 1990, arrested a man who had arrived on an Amtrak train from California carrying one-half kilo of cocaine. Kansas City police detective Pat Sola telephoned St. Louis police detective Alfred Carter, informing him of the arrest and detention, and notifying him that the arrestee's final destination had been St. Louis. After getting a description of the arrestee and his luggage from detective Sola, detective Carter assigned a detective

---

1. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

that fit the arrestee's general description to board the Amtrak train prior to St. Louis. Detective Carter hoped someone in St. Louis would think the detective was the courier and approach him.

Detective Carter also assigned detectives to conduct surveillance inside and outside the St. Louis Amtrak station. At the St. Louis Amtrak station, detective Carter, who was stationed in the parking lot, saw a van containing two men drive to the east end of the lot. The two men remained in the van for some period of time. After the train arrived, the van approached the Amtrak station and the passenger, later identified as appellant Wright, exited the van and entered the station. Once inside the station, Wright looked around briefly before walking to a pay phone. A police detective followed Wright to the phone and overheard him state that the "stuff" had not come in and that Chris would be "pissed."

After speaking with the detectives inside the station, detective Carter walked up to the driver of the van and identified himself as a police officer. Detective Carter told the driver that he and other officers were conducting a narcotics investigation and asked him if he would mind answering some questions. The driver agreed to speak with detective Carter. Asked by detective Carter for identification, the driver produced a Missouri driver's license identifying him as Charles Smith. While other officers ran a check on Smith's license, Smith told detective Carter he was at the station to pick up a lady named Brenda arriving from California. Smith did not know Brenda's last name and was unable to provide any further information about her. Smith told detective Carter he had picked up a guy from California the night before, and Brenda was this guy's girlfriend. When the license check revealed an outstanding bench warrant for Smith for destruction of property involving an automobile accident, police arrested Smith.

As Smith was being handcuffed, Wright began walking from the station to the van. Detective Carter met Wright on the ramp, identified himself as a police officer, in-

formed Wright that officers were conducting a narcotics investigation, and asked if Wright would speak with him. Wright told detective Carter he was at the station to pick up his girlfriend Tracy. He was unable to provide any further information about Tracy. Asked for identification, Wright produced a California driver's license in the name of Richard Wright with a Linwood, California, address. Detective Terry James, who was standing nearby, asked Wright whether he was affiliated with a gang in Los Angeles. Wright showed the detectives a tattoo on his arm and told them he was a member of the Linwood Neighborhood Crips gang. He also told detectives that he was on probation or parole in California and that his probation or parole officer was unaware of his presence in Missouri. Wright was not informed of his Miranda rights at this time. He answered all questions voluntarily and did not indicate that he wanted to speak to an attorney or that he wanted to end the interview.

Since detective Carter believed Wright was a possible probation or parole violator, Wright was handcuffed and taken to the police station. Upon arriving at the station, police contacted California authorities and were informed that Wright was wanted in California for parole violations. Detective Carter then read him his Miranda rights. Wright made no statements to police between the time he was handcuffed at the Amtrak station and the time he was advised of his Miranda rights.

Subsequent to receiving his Miranda warning, Wright did not ask to speak to an attorney or otherwise invoke his rights. Wright told police he had been in St. Louis on prior occasions and was involved with Chris Buchanan in the distribution of cocaine in St. Louis. He further stated that he had gone to the Amtrak station to meet another Linwood Neighborhood Crip who was transporting cocaine that they intended to sell to Buchanan. Wright agreed to make a series of phone calls in an effort to cooperate with detectives in an investigation of Buchanan. After he made the calls, Wright was booked. Several days later, Wright was read and signed a waiver form

that included the Miranda warnings. He thereafter agreed to reduce his prior statement to writing.

Meanwhile, shortly after arresting Smith, police read the Miranda warnings to him. Smith told officers that a female acquaintance in California had called him and asked him to pick up a man at the airport. Smith said he had picked up Wright at the airport, housed him overnight at his home, and taken him to the Amtrak station the next day.

Smith told the detectives that Wright's clothing and belongings were still at his home. Detective Carter asked Smith for permission to search the residence. He informed Smith he was not obligated to allow officers to search his home. Smith agreed to the search and signed a consent-to-search form. Smith accompanied officers to his home, opened the front door, and led them to the spare bedroom where Wright had stayed. Entering the room, police noticed a duffel bag on the bed. An American Airlines ticket folder visibly protruded from the unzipped bag. Police searched the bag and seized the airline ticket.

Wright sought to suppress statements made prior to his arrest, statements made subsequent to his Miranda warnings, and the airline ticket. The magistrate judge[2] held a suppression hearing and recommended that none of the statements or the ticket be suppressed. The magistrate judge concluded that Wright's statements prior to arrest were the result of a consensual encounter and, thus, the Fourth Amendment was not implicated. Alternatively, the magistrate judge ruled that even if the consensual encounter had progressed into an investigatory stop, police had the requisite degree of reasonable suspicion that criminal activity was afoot to support the investigatory stop. The magistrate judge ruled that Wright's post-arrest statements were admissible because they came after Miranda warnings. Finally, the magistrate judge concluded the airline ticket

was admissible because it was found in plain view during a consensual search. The district court adopted the magistrate judge's finding. Wright subsequently was convicted in a jury trial. He now appeals all of these findings.

### A. Statements

Wright argues that his pre-arrest statements to police were the result of an illegal stop and, therefore, must be suppressed as fruit of the poisonous tree. We review de novo the district court's determination that Wright's initial encounter with police was consensual. *United States v. McKines,* 933 F.2d 1412, 1426 (8th Cir.) (en banc), *cert. denied,* ── U.S. ──, 112 S.Ct. 593, 116 L.Ed.2d 617 (1991). We find Wright's challenge to this determination to be without merit. The Fourth Amendment is not implicated when police encounter a person in a public place, ask him a few questions, and request to see the person's identification. *Florida v. Bostick,* ── U.S. ──, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *United States v. Locklin,* 943 F.2d 838, 839 (8th Cir.1991); *United States v. Nunley,* 873 F.2d 182, 184 (8th Cir.1989); *United States v. Poitier,* 818 F.2d 679, 682 (8th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988). A consensual encounter ripens into a seizure implicating Fourth Amendment protections only when all the circumstances surrounding the encounter would lead a reasonable person to believe that he was not free to decline the officers' requests or otherwise terminate the encounter. *Bostick,* ── U.S. at ──, 111 S.Ct. at 2389; *McKines,* 933 F.2d at 1419.

Wright has pointed to no facts that would indicate that he was coerced in any manner or could believe reasonably that he was not free to leave. Detective Carter stopped Wright on a public walkway. Detective Carter displayed no weapon and was accompanied only by detective James, who stood slightly behind detective Carter. Both detectives wore plain clothes. Detec-

**2.** The Honorable John T. Maughmer, Chief United States Magistrate Judge for the Western District of Missouri.

tive Carter did not use coercive language. He did not pen Wright into an enclosed space or remove him to an enclosed office. He did not indicate that Wright was not free to leave, and did not indicate that Wright was the focus of a drug investigation. In short, Wright has presented no evidence that would indicate to a reasonable person that he was not free to leave, or could refuse to answer police questioning. Therefore, the district court properly refused to suppress Wright's statements made during the initial encounter with police.

Wright argues, further, that the illegality of his initial seizure required the court to suppress his post-arrest statements as fruit of the poisonous tree. Our finding that the initial conversation with police was a consensual encounter disposes of this argument. Wright's voluntary statements during the initial encounter led detective Carter to believe that Wright was a possible parole or probation violator. When detective Carter placed Wright in handcuffs, a seizure occurred. *See Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). Detective Carter had sufficient probable cause—based on Wright's own statements—to believe that Wright was committing, or had committed, a crime. Further, police did not interrogate Wright, and Wright made no statements to police, from the time he was handcuffed until he was read Miranda warnings about five to ten minutes later. Police are required to issue Miranda warnings only prior to custodial interrogation. *United States v. Venerable*, 807 F.2d 745, 747 (8th Cir.1986); *United States v. Wallraff,* 705 F.2d 980, 991 (8th Cir.1983). The only statements made by Wright linking him to the cocaine conspiracy came after he was read and waived his Miranda warnings. He makes no claims that the waiver of his right to remain silent and to be represented by counsel was not knowing and voluntary. Therefore, Wright suffered no denial of Fourth Amendment protections and the district court properly rejected his suppression motion.

**B. The Search**

Wright contends that the airline ticket seized by police at Smith's home was the result of an illegal search and, therefore, should have been suppressed. A search conducted pursuant to valid consent does not violate the Constitution. *United States v. Ramey*, 711 F.2d 104, 107 (8th Cir.1983). Valid consent may be given by a third party "who possessed common authority or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974); *United States v. Wade*, 740 F.2d 625, 629 (8th Cir.1984).

Smith possessed authority to consent to a search of his own home, including the guest bedroom where Wright spent the evening. *United States v. Block*, 590 F.2d 535, 541 (4th Cir.1978). We need not determine whether Smith had authority to consent to a search of Wright's bag. When police entered the small room, they observed the airline ticket in plain view jutting out of the bag. The authority to consent to a search of a general area obviously extends to objects in plain view within the area. *Id.* Police did not seize any items from Wright's bag other than the airline ticket, which they observed in plain view. Therefore, the district court properly refused to suppress the airline ticket.

**II.**

For the foregoing reasons, the judgment of the district court is affirmed.