# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

——————

No. 02-2826

——————

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the District |
| | * | of Minnesota. |
| Henry Vincent Kelly, | * | |
| | * | |
| Defendant-Appellant. | * | |

——————

Submitted: February 10, 2003
Filed: May 27, 2003

——————

Before WOLLMAN, RICHARD S. ARNOLD, and MELLOY, Circuit Judges.

——————

MELLOY, Circuit Judge.

Defendant-Appellant Henry Vincent Kelly appeals the district court's[1] denial of his multiple motions to suppress statements and evidence. In addition, he asks this court to review the denial of his motion for a downward departure pursuant to

——————

[1] The Honorable James M. Rosenbaum, Chief Judge, United States District Judge for the District of Minnesota, approving the report and recommendation of United States Magistrate Judge Franklin L. Noel as to the suppression issues.

U.S.S.G. § 4A1.3. We affirm the district court's denial of Kelly's suppression motions and find the district court's discretionary refusal to depart downward unreviewable.

I.

At approximately 5:00 a.m. on December 29, 2000, a night security officer at a Brooklyn Center, Minnesota, hotel called police to report that she detected the odor of marijuana in the hotel's hallway near rooms 212 and 214. The officers who responded to the call arrived about thirty-five minutes later but could not detect the odor. From the hotel clerk, officers learned that five guests had arrived at approximately 3:30 a.m. and checked into rooms 212 and 214. One of the five, a man who presented a Texas drivers license and identified himself as Darrin Hunter, attempted to register for the rooms. The clerk required the occupants of each room to register separately, so a woman who identified herself as Celestine Marshall registered for the second room. Mr. Hunter paid for the rooms. The group left for about an hour, then returned. One of the five left again shortly before the night security officer called police about the odor.

The officers ran background checks on Hunter and Marshall and found no outstanding warrants. The officers remained concerned about the reported odor so they knocked on the door to room 212. Juan Jose Salazar answered the door. The officers explained why they were called to the hotel. Salazar consented to their entry and agreed to answer questions. Salazar denied marijuana use, admitted that he did not rent the room, and said that his boss had paid for the room. Salazar identified his boss as Henry Kelly, not as Darrin Hunter. Salazar claimed to be traveling with Kelly, Kelly's wife, and another woman. He repeatedly changed his explanation of the purpose of their trip. He first stated that they had come to celebrate New Year's Eve. Next, he claimed that they had just arrived on Sun Country Airlines from Texas en route to visiting relatives and had decided to stay at a hotel due to their late arrival. Later still, he said that the group had come to Minnesota as part of Kelly's carpet

2

cleaning business. Due to the inconsistencies in Salazar's responses, including the fact that the hotel was not conveniently located relative to the airport, officers asked for and received Salazar's permission to search the room. The search revealed approximately one kilogram of cocaine inside a piece of luggage.

When the officers were arresting Salazar, he spontaneously stated that Kelly and Kelly's wife had access to the luggage and that they could have placed the cocaine in the luggage. The officers called for assistance. When more police arrived, they knocked on the door to room 214, obtained permission from Kelly to enter the room, and arrested Kelly, his wife, and Marshall for conspiracy to possess a controlled substance. After Kelly was taken to the station, an assisting officer found a black billfold on the floor near the entrance to the holding facility at a location along the path that Kelly had walked. The billfold contained Kelly's social security card as well as Texas drivers licenses for Adam Carson and Darrin Hunter.

At the station, Kelly met with an officer named Sargent Lund for an interview. Lund informed Kelly of his Miranda rights and the state law requirement that all interviews be taped. When Lund began to ask Kelly questions about the drugs found in room 212, Kelly denied any knowledge and invoked his right to remain silent by asking to be returned to his cell. Sargent Lund terminated the interview. He subsequently released Kelly, Kelly's wife, and Marshall because he did not believe that the evidence was sufficient to charge them with conspiracy. A later search of room 214 pursuant to a warrant revealed a cell phone, daily planner, and appointment book. These were the only items found in and seized from room 214.

Investigation into Kelly continued. A DEA agent sent administrative subpoenas that sought documents and information concerning Kelly including a subpoena duces tecum that directed Kelly to produce the records of his carpet cleaning business. Officers never served the subpoena duces tecum because they could not locate Kelly. On December 3, 2001, over eleven months after the initial

3

arrest, a grand jury convened to consider indicting Kelly. That same day, Kelly inexplicably appeared at the office of the United States Attorney and said that he had driven from Texas to respond to the unserved subpoena. An Assistant United States Attorney and a Drug Enforcement Agency agent invited Kelly into a conference room and told him that the unserved subpoena sought business records, not testimony. Kelly spoke willingly with the agent and attorney. When the agent tried to read Kelly his Miranda rights, Kelly terminated the meeting and asked, "do you know any good attorneys?" Kelly then left the office. The grand jury subsequently indicted Kelly and a Minnesota arrest warrant was issued.

Kelly then traveled to Las Vegas, Nevada, where he lived and where he was on probation for earlier offenses. On December 13, officers arrested Kelly in Las Vegas on the Minnesota warrant. Kelly was carrying over $3,000 in cash at the time of the arrest. The same DEA agent who spoke with Kelly at the December 3 meeting was involved in transporting Kelly after the arrest in Nevada. The agent believed that Kelly may have invoked his right to counsel when he terminated the December 3 meeting. As a result, the agent told Kelly that Kelly would have to reinitiate any conversation in order to speak to the agent. Kelly responded, "I'll holler with you later on." Then, while transporting Kelly, the agent read Kelly the Miranda warnings. Kelly waived his rights, and the agent proceeded to question him. In response to these questions, Kelly made incriminating statements about the source of the $3,000.

At trial, evidence arising from Kelly's December 29, 2000 arrest was admitted over Kelly's objection that the arresting officers lacked probable cause to perform the warrantless arrest and entry into his hotel room. In addition, Kelly's statements of December 3 and 13, 2001, were admitted over his objections. Kelly argued that these statements were fruit of the poisonous tree from the original, allegedly infirm arrest and that they were inadmissible because he had invoked his right to remain silent on December 29, 2000, but officers had not scrupulously honored that right. Finally, he argued that his statements of December 13 were inadmissible because he had invoked

4

his right to remain silent and his right to the assistance of counsel on December 3.

Kelly was convicted for possession with intent to distribute and conspiracy to distribute the cocaine that was seized from Salazar's room. Kelly was sentenced as a career offender because he had two prior felony convictions. One of these convictions stemmed from an indictment that described the trafficking of eighty grams of cocaine. Kelly's guilty plea in that case actually involved between four and fourteen grams of crack cocaine. Kelly argued that the prior conviction overstated the seriousness of his criminal history and that he should receive a downward departure under U.S.S.G. § 4A1.3. The district court refused to grant a downward departure and sentenced Kelly to 262 months imprisonment.

## II.

In the context of suppression motions, we review the district court's factual findings for clear error and its legal determinations de novo. United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002). On the specific question of whether probable cause existed to justify an arrest without a warrant, the ultimate determination as to the existence of probable cause is a legal question that we review de novo. Id. at 824.

Kelly first argues that his warrantless arrest on December 29, 2000, was unsupported by probable cause. We disagree. To determine the existence of probable cause, we look at the totality of the circumstances as set forth in the information available to the officers at the time of arrest. Illinois v. Gates, 462 U.S. 213, 230-39 (1983). We will find that probable cause existed at the time of arrest where the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested. Dunaway v. New York, 442 U.S. 200, 208 n.9 (1979); United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001).

5

At the time of arrest, the officers knew the following: Kelly, Salazar, and their companions arrived at the hotel at 3:30 a.m. after traveling together from Texas, a drug source state; Kelly attempted to register for both rooms; Kelly registered for his room under a different name and paid cash for Salazar's room as well as his own; Salazar gave three apparently unrelated explanations for their presence in Minnesota (to visit someone's family, to celebrate the New Year's holiday, to conduct activities related to Kelly's alleged carpet cleaning business); Salazar's explanation of their choice of a hotel was inconsistent with the hotel's location; a hotel security guard had detected the odor of marijuana in the hallway outside their rooms at approximately 5:00 a.m., but any such odor that might have been present had dissipated by approximately 5:30 a.m.; the luggage in Salazar's room contained approximately a kilogram of cocaine; and Salazar stated that Kelly and the others in Kelly's room had access to the luggage. The cumulative effect of this information provides a more than adequate basis for finding probable cause. United States v. Tyler, 238 F.3d 1036, 1038 (8th Cir. 2001) (stating that in the assessment of probable cause "we do not evaluate each piece of information independently; rather, we consider all of the facts for their cumulative meaning").

Kelly next argues that because the police lacked exigent circumstances, their entry to his hotel room without a warrant was improper. Kelly's argument is without merit. It is undisputed that the officers knocked and obtained Kelly's permission to enter. Payton v. New York, 445 U.S. 573, 576 (1980) (stating that the Fourth Amendment "prohibits the police from making a warrantless and *nonconsensual entry* into a suspect's home in order to make a routine felony arrest.") (emphasis added); see also State v. Conner, 127 F.3d 663, 666 (8th Cir. 1997). There is no allegation that deception was used to gain entry or that Kelly's consent was involuntary. United States v. Briley, 726 F.2d 1301, 1304 (8th Cir. 1984) (stating that a "misrepresentation may even invalidate . . . consent if the consent was given in reliance on the officer's deceit"); Conner, 127 F.3d at 666 (holding that warrantless arrest was improper where consent to entry was involuntary). Accordingly, because the

6

warrantless arrest was supported by probable cause and because the entry to the hotel room was consensual, Kelly's arguments fail.

Kelly next argues that the wallet discovered by officers on the floor of the station and his statements of December 3 and 13, 2001, should have been suppressed as fruit of the poisonous tree from the allegedly unconstitutional December 29, 2000 arrest. As just explained, the arrest was not infirm. Further, when Kelly discarded the wallet to avoid its discovery he also discarded any privacy interest he may have had in the wallet or its contents. United States v. Tugwell, 125 F.3d 600, 602-03 (8th Cir. 1997) (stating that defendant had no privacy interest in abandoned property).

Kelly next argues that because he invoked his right to remain silent on December 29, 2000, his statements of December 3 and 13, 2001, should have been suppressed. Again, we disagree. When a defendant invokes his right to remain silent, officers must scrupulously honor that right. Michigan v. Mosley, 423 U.S. 96, 102-04 (1975) (holding that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored'" and noting "[no] passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." ). We are satisfied that the officers in this instance scrupulously honored Kelly's right to remain silent. On December 29, when Kelly refused to speak, officers terminated the interview. Shortly afterwards, officers released Kelly, his wife, and Marshall from custody. The local law enforcement officers did not reinitiate contact with Kelly. Rather, over eleven months passed during which time Kelly was neither in custody nor questioned. When a different set of officers (the AUSA and the DEA agent) next spoke with Kelly, it was not in a custodial situation. Rather, it was in a voluntary meeting initiated by Kelly through his mysterious arrival in Minnesota to discuss the unserved subpoena. In addition, the statements of December 13 were subsequent to a re-reading of the

7

<u>Miranda</u> warnings and Kelly's knowing and voluntary waiver of his rights.

Finally, Kelly argues that his statement of December 13 should have been suppressed because he terminated the meeting of December 3 and asked if the agent and government attorney knew any good lawyers. Kelly's arguments in this regard fail both as to his right to remain silent and his right to the assistance of counsel. Because Kelly was not subject to custodial interrogation on December 3, he was not entitled to the protections of <u>Miranda</u>. As such, Kelly's termination of the voluntary encounter posed no independent barrier to later questioning.

Even if the officers had been required to offer Kelly the protections of <u>Miranda</u>, however, Kelly's arguments would fail. Regarding Kelly's right to remain silent, the DEA agent scrupulously honored Kelly's right. Ten days passed after Kelly terminated the voluntary meeting and before the DEA agent resumed speaking with Kelly. Before questioning Kelly, the DEA agent provided the <u>Miranda</u> warnings, and Kelly made a knowing and voluntary waiver of his rights. Regarding Kelly's alleged invocation of his right to the assistance of counsel, we have consistently held that only a clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right. <u>Davis v. United States</u>, 512 U.S. 452, 455 and 459-61 (1994) (holding that the statement, "[m]aybe I should talk to a lawyer" was insufficient to alert a reasonable police officer that the defendant was requesting counsel and stating that, although it is good policy for police officers to clarify ambiguous statements, they are not required to do so); <u>see also</u> <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 805 (8th Cir. 2001) (holding on habeas review that it was not an unreasonable application of clearly established Supreme Court precedent for a state court to find the statement, "[c]ould I call my lawyer?" insufficient to invoke the right to counsel and mandate the termination of questioning). Kelly's vague statement of December 3 was not an unequivocal request for the assistance of counsel.

Regarding the issue of Kelly's sentencing, we find the denial of his request for

a downward departure unreviewable. The discretionary denial of a motion for downward departure based on overstated criminal history is not reviewable unless the district court determined that it lacked authority to consider the motion. United States v. Lim, 235 F.3d 382, 385 (8th Cir. 2000); United States v. Correa, 167 F.3d 414, 417 (8th Cir. 1999). Here the district court determined that Kelly was a career offender, knew of the circumstances surrounding Kelly's allegedly overstated prior conviction, knew of its ability to depart, and elected not to exercise its discretion to do so. Accordingly, because the district court did not determine that it lacked authority to consider the motion, we may not review the district court's discretionary decision.

The district court is affirmed.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

9