# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1053

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | Appeal from the Untied States |
| Appellant, | * | District Court for the Western |
| | * | District of Arkansas. |
| v. | * | |
| | * | |
| Carl Mac Adams, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: June 12, 2003

Filed: October 17, 2003

_____

Before MELLOY, BEAM, and SMITH, Circuit Judges.

_____

BEAM, Circuit Judge.

The government appeals from the district court's suppression of evidence obtained incident to the warrantless arrest of Carl Mac Adams and subsequent search of Adams's residence. Because we find probable cause to support the warrantless arrest of Adams and determine that Adams's girlfriend voluntarily consented to the guided "search" that led to the discovery of probative evidence used in the application of a valid search warrant, we reverse.

## I.    BACKGROUND

On May 2, 2002, three juveniles were arrested during a burglary investigation in Washington County, Arkansas.  The juveniles told police officers that they had taken stolen firearms and other property obtained from the burglaries to David Michael Moseley.  After Moseley's subsequent arrest on May 3, 2002, he told police, against his own penal interest, that he had traded two firearms to Adams for drugs. With that information, officers proceeded to Adams's home.

It is undisputed that at the time the four officers arrived at Adams's residence on May 3, 2002, they had neither a warrant to search his residence nor a warrant for his arrest.  Officer Barry Puckett testified that he did not get a search warrant for Adams's residence because many times people are forthcoming and cooperative when they realize they have received stolen property.  Once at the residence, two of the officers introduced themselves at the front door and one officer displayed his badge. The officers then entered Adams's home but the precise details of that entry is not clear from the record.  Puckett testified that after he identified himself and explained to Adams that they were there to investigate stolen property, Adams allowed them in by stepping back and gesturing accordingly.  Adams, however, testified that although he did not ask the officers to leave the premises, he also did not invite the officers in.

Once inside, the men walked through the house and congregated in the garage. During the subsequent conversations, Adams confirmed that he bought firearms from Moseley on May 2, 2003, but denied trading drugs for them.  According to Puckett, when he informed Adams that the guns were in fact stolen, Adams declared that the officers would not get the guns or search any further without a warrant.  Puckett also denied that Adams offered to get the guns.  Adams testified that he made such an offer and his girlfriend corroborated this statement.  At that point, Adams was placed under arrest.  During the pat-down incident to the arrest, the officers discovered a quantity of methamphetamine in Adams's pocket.

After Adams was arrested and taken to the patrol car, Puckett spoke with Adams's live-in girlfriend, explaining the arrest and the course of their investigation, noting that they were going to apply for a warrant to search the residence. In fact, Puckett had intended to apply for a warrant at the time of Adams's arrest. Adams's girlfriend confirmed Moseley's presence at Adams's house on May 2, 2003, and that Adams had numerous firearms in the house. According to Puckett, the girlfriend then offered to show him several locations in the house where there were guns.

The girlfriend testified that while she did not give her consent to search the house, she did take Puckett through the house showing him guns because she was "just being nice." She further testified that she was afraid of getting arrested for withholding consent. It was during the girlfriend's ensuing "tour" that Puckett saw what appeared to be a bag of marijuana in plain sight on the bed. At that point, the girlfriend told Puckett to stop searching and they all walked outside without seizing any items from the home. Adams's girlfriend was arrested for possession.

The officers then secured the home and completed an affidavit for a search warrant. Upon issuance of the warrant, the officers conducted a full search of the residence and its contents, uncovering several firearms including the two stolen firearms that were the focus of the initial investigation, along with drugs, drug paraphernalia, and cash.

Adams was charged in a four-count indictment with possessing fifty grams or more of methamphetamine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); receiving and possessing and concealing a stolen firearm which had been transported in interstate commerce, knowing and having reasonable cause to believe that the firearm was stolen in violation of 18 U.S.C. §§ 922(j) and 924(a)(2); knowingly using and carrying a firearm in relation to a drug trafficking crime and possessing a firearm in furtherance of a drug trafficking crime

in violation of 18 U.S.C. § 924(c)(1); and knowingly possessing one or more of nine firearms, all of which had been transported in interstate commerce, after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g), 924(a)(2) and 924(e)(1).

Prior to trial, Adams filed a motion to suppress, arguing that law enforcement officers entered his residence without consent or a warrant and that his arrest and the subsequent seizure of items were unlawful. The district court granted Adams's motion to suppress holding that while the totality of the circumstances supported the voluntariness of Adams's consent for the officers to enter into and remain within his residence, there was insufficient probable cause to support Adams's warrantless arrest. The court further held that because Adams's arrest was unlawful, the contraband seized from the pat-down incident to his arrest must be suppressed. Finally, the court held that Adams's girlfriend did not voluntarily consent to search the residence even though she ultimately walked Puckett through the house and pointed out where guns were stored, thus tainting the subsequent search warrant. The government appeals.

## II.  DISCUSSION

"In the context of suppression motions, we review the district court's factual findings for clear error and its legal determinations de novo." United States v. Kelly, 329 F.3d 624, 628 (8th Cir. 2003). The specific question of whether probable cause existed to justify an arrest without a warrant is a legal question that we review de novo. Id.

We agree with the district court's determination that the totality of the circumstances supports the voluntariness of Adams's consent for the officers to enter into and remain within his residence. We part company with the district court, however, with regard to the warrantless arrest of Adams, and the voluntary consent of Adams's girlfriend to search the residence.

-4-

## A.     Warrantless Arrest

To justify a warrantless arrest, probable cause must exist.  "To determine the existence of probable cause, we look at the totality of the circumstances as set forth in the information available to the officers at the time of the arrest." Id.  We will find that probable cause existed at the time of arrest when the available facts and circumstances are sufficient to warrant a person of reasonable caution to believe that an offense was being or had been committed by the person to be arrested.  Id.

At the time of Adams's arrest, the officers knew the following: the day before the events at issue, three juveniles had admitted that they perpetrated burglaries and carried stolen property, including firearms, to Moseley; after a search and subsequent arrest of Moseley, Moseley told police that he had traded two firearms to Adams for drugs the previous day, and provided officers Adams's name and address; the address was, in fact, the residence of Adams; officers monitored Adams's residence for a period of time before approaching and observed quite a bit of foot traffic in and out of Adams's residence, which traffic indicated the potential for drug dealing; in conversation with the officers, Adams admitted that he knew Moseley, corroborated Moseley's story that he had received two guns from Moseley on the previous day, and confirmed that he possessed the firearms matching the description of the stolen guns provided by the officers.

The district court held that while prior to Adams's arrest the officers could have reasonably believed that Adams was in possession of two firearms which had, in all likelihood, been stolen, they did not have sufficient information to conclude that Adams actually committed the crime of theft by receiving because Adams denied any knowledge whatsoever that the guns were stolen.  The district court further held that the chain of events leading up to the warrantless arrest cut deeply into the detective's explanation for not securing a search warrant in the first place–namely that the

-5-

detective never offered Adams the opportunity to be forthcoming and bring the guns to him as he stated people are likely to do when faced with the reality that they may have received stolen property.[1]  The district court found that such a dichotomy lent itself to the conclusion that Puckett bypassed the warrant requirement by assuming he could bluff or bully Adams into consenting and then making a warrantless arrest. We take a different view.

The officers were not required to have certain proof that Adams knew the guns were stolen.  The corroborated evidence supported the idea that Adams did know. While bare suspicion of criminal activity is not sufficient to establish probable cause, police are not required to have enough evidence to justify a conviction before they make a warrantless arrest.  United States v. Morales, 923 F.2d 621, 624 (8th Cir. 1991).  "We must give law enforcement officers 'substantial latitude in interpreting and drawing inferences from factual circumstances,' but such latitude is not without limits."  Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (quoting United States v. Washington, 109 F.3d 459, 465 (8th Cir. 1997)).  However, we recognize that within the purview of the "totality of circumstances" analysis, evidence that tends to negate the possibility that a suspect has committed a crime is relevant to the probable cause inquiry.  Id.  "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists."  Id.

---

[1]Both parties and the district court discussed the conflict in testimony concerning the legal effect of Adams's supposed offer to retrieve the guns for the officers.  While Adams claims he made such an offer, Puckett testified otherwise. Notwithstanding this discrepancy, we note that even if this offer had been made, it seems apparent that a prudent police officer under similar circumstances would not let an unaccompanied subject retreat into a residence to retrieve firearms.  Whether the offer was made or not is of no consequence.  Adams clearly denied consent to search the residence and that is sufficient for our analysis.

The officers in this case had far more than a bare suspicion that Adams had committed the offense of theft by receiving. Even though Adams claimed he had purchased the firearms from Moseley and did not know that they were stolen, the officers had a reasonably sufficient basis for believing otherwise. Adams was in possession of stolen guns and Moseley had previously told Puckett that he had exchanged the stolen guns for methamphetamine. The remaining facts disclosed to the officers by Moseley were corroborated upon arrival at Adams's residence, and the officers' surveillance of Adams's residence disclosed traffic coming and going at a level consistent with drug dealing. Further, Puckett testified that it is his experience in law enforcement, when weapons are traded for drugs, more often than not, the weapons are stolen. The only exculpatory evidence known to the officers at the time of his arrest was Adams's self-serving statement that he had purchased the guns from Moseley. This is not enough to tip the scale in Adams's favor.

The cumulative effect of the information known to the officers at the time of Adams's arrest provides a sufficient basis for a finding of probable cause. The officers had enough reasonably trustworthy information to allow a prudent person to believe that Adams had committed the offense of theft by receiving.

Because the officers had sufficient probable cause to arrest Adams without a warrant, it follows that the contraband seized from the pat-down search incident to his arrest is admissible. United States v. Bell, 86 F.3d 820, 822 (8th Cir. 1996).

**B.     Search of Adams's Residence**

The district court also excluded the evidence obtained upon execution of the search warrant acquired after Adams's girlfriend showed Puckett through the residence, holding that she did not voluntarily consent to the search even though she ultimately walked Puckett through the residence and pointed out where guns were

stored. The district court placed great weight on Adams's girlfriend's testimony that just prior to her own conversation with Puckett, she had overheard Adams deny consent to search and then saw him arrested and taken from the residence in handcuffs. The district court believed this testimony implied that Puckett made her feel the very same thing could happen to her. Once again, the district court took the view that Puckett bluffed his way into searching the home by insinuating that Adams's girlfriend risked arrest if she did not cooperate. Our review of the record does not support such a conclusion.

"The government may obtain consent for a warrantless search from the defendant or 'from a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" United States v. Czeck, 105 F.3d 1235, 1239 (8th Cir. 1997) (quoting United States v. Matlock, 415 U.S. 164, 171 (1974)) (alterations in original). "The relevant inquiry is whether the facts available would have justified a reasonable officer in the belief that the consenting party had authority over the premises." Id. Because there is no dispute concerning the ability of the live-in girlfriend to provide consent to search this residence, the issue is the voluntariness of such consent. The standard for measuring the scope of consent under the Fourth Amendment is that of "objective" reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the individual? Florida v. Jimeno, 500 U.S. 248, 251 (1991). "The question of whether an expression of consent is voluntary or coerced is also a question of fact, subject to review for clear error." United States v. Jones, 254 F.3d 692, 696 (8th Cir. 2001).

At the suppression hearing, Adams's girlfriend testified that when Puckett approached her and told her it would be easier for her if she consented to a search of the house, she initially said no. She also testified that she overheard the previous conversation between Adams and the officers and witnessed his arrest. But, she did

not discuss the effect that this observation had on her. However, in spite of her initial denial and refusal to let the officers search the house, she testified that she did take them through the house because she knew there were a lot of guns in the house. During cross-examination, she testified that she showed Puckett where the guns were: "I didn't know if there were any stolen guns in the house, but there were always guns in the house and I clean the house all the time, and I just showed Mr. Puckett where the guns were out of, I guess, just being nice." In fact, she explicitly testified that Puckett did not tell her that Adams had made it harder on himself or that his denial of consent led to his arrest. Puckett merely told her that things would go easier for her if she agreed to show him where the guns were. It was only on redirect, when asked directly if she was afraid of being arrested, that she testified that she was afraid.

It is clear from the girlfriend's testimony and Puckett's testimony that although she did not consent to Puckett freely searching the residence without her accompaniment, she certainly consented, and in fact offered, to show Puckett several locations in the house where there were guns. We find that any reasonable person would have believed this to be consensual. Puckett did not seize any evidence during this tour and it was only when he noticed what appeared to be a bag of marijuana in plain view in the bedroom that the girlfriend stopped the search. At that point, the officers arrested her and applied for a search warrant and proceeded accordingly. We find no support for the district court's determination that Adams's girlfriend did not give consent for the guided tour of the residence.

Even though the detective told Adams's girlfriend that she could make it easy by consenting and obviating the need for the search warrant, this is not per se coercive. See United States. v. Severe, 29 F.3d 444, 446 (8th Cir. 1994) (holding that it was not per se coercive if consent is obtained after officers have threatened to obtain a search warrant–that is only one factor in the totality of the circumstances inquiry.) The fact that she stated she was afraid of being arrested is of little

consequence. Clearly there were other reasons justifying her fear of arrest in this situation, and, based upon her testimony, her fear of arrest was not the initial reason she gave for her offer to show Puckett around. Under these circumstances, and viewing the totality of the circumstances, we find that Adams's girlfriend voluntarily consented to Puckett's search of the residence. The district court's determination to the contrary is clearly erroneous.

As before, because we hold that Adams's girlfriend voluntarily consented to the search of the residence that resulted in the discovery of probative evidence used in the supporting affidavit for the search warrant application, we find the evidence seized pursuant to that warrant admissible. See Czeck, 105 F.3d at 1240 (affirming the denial of suppression of evidence upon a finding of consent).

## III.   CONCLUSION

Because we find the warrantless arrest was lawful and that Adams's girlfriend voluntarily consented to a search of the residence, we reverse the district court's grant of the motion to suppress and remand for adjudication in accordance with this opinion.

SMITH, Circuit Judge, dissenting.

I respectfully dissent from the majority's conclusion that Adams's girlfriend consented to the search of Adams's residence. As the majority notes, a third party may consent to a search. *United States v. Wright*, 971 F.2d 176, 180 (8th Cir. 1992). This is a factual determination, which we review for clear error. *United States v. Tirado*, 313 F.3d 437, 439 (8th Cir. 2002). Thus, we will "affirm the trial court's decision

unless it is not supported by substantial evidence, it evolves from an erroneous conception of the applicable law, or we are left with a firm conviction that a mistake has been made after having considered the entire record." *United States v. Wallraff*, 705 F.2d 980, 987 (8th Cir. 1983) (citation omitted). Having thoroughly reviewed the record, I cannot say that the district court committed clear error.

Consent is "voluntary if it was 'the product of an essentially free and unconstrained choice by its maker,' . . . rather than 'the product of duress or coercion, express or implied.'" *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 227 (1973)). When determining whether or not the consent was coerced, the majority relies heavily on the fact that Adams's girlfriend led police through the house. While that fact favors a finding of consent, it is not the only factor we consider when determining whether or not a search is voluntary. Rather, the "determination depends upon the totality of the circumstances in a particular case, including 'both the characteristics of the accused and the details of the interrogation.'" *Id.* at 380–81 (citing *Bustamonte*, 412 U.S. at 226).

When evaluating the voluntariness of a person's consent, we consider the following: (1) the person's age; (2) the person's general intelligence and education; (3) whether the person was intoxicated or under the influence of drugs when consenting; (4) whether the person consented after being informed of their right to withhold consent or of their *Miranda* rights; (5) whether, because the person had been previously arrested, the person was aware of the protections afforded to her, as a suspected criminal of the legal system. *Id.* at 381 (citations omitted).

Likewise, when we consider the environment in which the consent was given, we pay particular attention to whether the person who consented:

(1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Id.* (citations omitted). Again, when applying these factors, no single fact–like the fact that Adams's girlfriend led police through the house–is determinative. *Chaidez*, 906 F.2d at 380. After considering all of the factors, I believe that the district court's finding is not clearly erroneous.

First, although the evidence shows Adams's girlfriend was an adult, was not under the influence of any drug, and was of sufficient mental capacity to consent, there is no evidence that she was ever informed of her right to withhold her consent. *Id.* (noting that if police do not inform a party of the right to refuse, it "is a significant, [although] not determinative[ ]factor cutting against a finding of voluntariness"). Moreover, there is nothing to indicate that Adams's girlfriend had a criminal background or prior experience with searches. Thus, it is at best questionable whether she understood the ramifications of a residential police search.

This is especially pertinent when one considers the environment under which she allegedly consented. She was secluded inside of Adams's house and surrounded by several police officers. These same officers had just interrogated and arrested Adams and informed her that they arrested Adams because "he didn't want [them] to search" the house. According to Adams's girlfriend, the detective then suggested that "it would be easy for" her if she "would consent for him to search the house." While it is true Adams's girlfriend was not under arrest when she led police through the house, the environment–including Officer Puckett's misrepresentations and implicit

threats–could have led a reasonable person to believe she had to consent to the search in order to avoid arrest.

Moreover, the trial judge based his determination largely on the fact that he credited Adams's girlfriend's testimony and discounted Officer Puckett's testimony. The majority, though, has essentially disregarded the trial court's credibility determination. Credibility determinations are not the province of appellate courts. Instead, the trial judge is given substantial deference to weigh such testimony. *See, e.g.*, *United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993) ("When a finding of fact is based on determinations of credibility, this court must pay even greater deference to the district court's findings.") (citation omitted).

Thus, I cannot say that the trial judge's determination on this issue was clearly erroneous. As a result, I respectfully dissent from the majority's conclusion that it was clear error to suppress the evidence seized after the search of Adams's residence. In all other respects, however, I concur with the majority's well-reasoned opinion.

_____