# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1386

_____

United States of America,     *
    *
       Appellee,     *
    *   Appeal from the United States
    v.     *   District Court for the
    *   District of Minnesota.
Rey Gama Mendoza,     *
    *
       Appellant.     *

_____

Submitted: November 16, 2004
Filed: August 30, 2005

_____

Before WOLLMAN, HEANEY, and FAGG, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Rey Gama Mendoza appeals from his conviction on one count of conspiracy to distribute and possess with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846, and one count each of aiding and abetting possession with intent to distribute cocaine base and aiding and abetting the distribution of cocaine base, both in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2. We affirm.

## I.

In April 2003, a confidential source informed the Minneapolis Police Department that Cassandra Holmes was engaged in dealing both powder and crack cocaine. On May 22, 2003, an undercover agent of the Minneapolis Police Department (Officer Luis Porras) set up a meeting with Holmes at her residence. Porras and Holmes then negotiated the purchase of one ounce of crack for $950. Holmes stepped away from Porras and immediately made a cellular telephone call to an unidentified person, the contents of which Porras was not able to hear. Holmes subsequently returned to Porras and discussed future transactions, mentioning that "her guy"—which Porras took to be an identification of her drug source—was a Hispanic male.

Approximately fifteen minutes after the call, surveillance officers outside the house observed a Hispanic male arrive on a bicycle. The officers testified that their experience and training led them to believe that the individual was a runner—someone who delivers drugs to a low or mid-level dealer and then takes the profits to the drug source. When the individual knocked on Holmes's door, Holmes told Porras that "her guy" had arrived, stepped out of Porras's sight, and answered the door. The individual delivered one ounce of crack to Holmes and left with the pre-recorded buy money from Porras. Holmes then reappeared and handed the ounce of crack to Porras. Although officers pursued the individual on the bicycle after he left Holmes's residence, they were unable to capture him.

On June 5, 2003, Porras again arranged to purchase crack from Holmes. Unlike the May 22 deal, however, Porras and Holmes agreed beforehand that Porras would purchase four ounces of crack for $3800. When Porras arrived, Holmes retrieved the drugs from a bag in her kitchen and completed the transaction. After Porras left the residence, Minneapolis narcotics officers entered, arrested Holmes, and secured the scene to await a search warrant. The arresting officers noted that Holmes

had a cellular phone in hand when they arrived and had commenced or completed a call just prior to their entry.

Fifteen minutes after the entry, surveillance officers outside the residence observed two Hispanic males approach in a sport utility vehicle. At the time, there were approximately eight undercover police vehicles parked near the residence. The vehicle traveled at slow speed, and both occupants stared intently in the direction of Holmes's residence. After passing the residence and circling the block, the vehicle approached the scene a second time. The occupants again focused their attention on the residence and, after parking behind one of the undercover vehicles, continued to stare at the house while occasionally looking in other directions and engaging in conversation between themselves.

Eventually, the driver of the vehicle exited and walked approximately two feet away from his door, which remained open. The driver looked at the front door of Holmes's residence, looked around the whole area, made eye contact with one of the undercover officers, and abruptly got back into the vehicle and drove away at high speed. The undercover officers relayed this information to the officers inside the residence and were told to stop the vehicle. The police then arrested Mendoza, the driver of the vehicle, and seized an identification card and a cellular phone from him. A brief inspection of the phone showed that the last number received on the phone had originated from Holmes's cellular phone. A subsequent investigation revealed that the call made by Holmes at the May 22 deal had also been placed to Mendoza's phone.

Prior to trial, Mendoza moved to suppress the cellular phone and all evidence obtained thereby on the ground that the officers lacked probable cause to arrest him.

-3-

The district court[1] denied Mendoza's motion, and Mendoza was subsequently convicted after a joint trial with Holmes and sentenced to a term of 121 months' imprisonment, five years of supervised release, and a $300 special assessment.

## II.
### A.

On appeal, Mendoza renews his argument that the police lacked probable cause to arrest him. We review *de novo* the district court's determination of probable cause and its factual findings for clear error. United States v. Cabrera-Reynoso, 195 F.3d 1029, 1031 (8th Cir. 1999). Probable cause exists if the totality of the circumstances known to all officers involved at the time of the arrest "were sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense." Id. (citation and internal quotations omitted); United States v. Amaya, 52 F.3d 172, 174 (8th Cir. 1995) (totality of the circumstances); United States v. Morgan, 997 F.2d 433, 435 (8th Cir. 1993) (court may consider collective knowledge). Because probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, United States v. Payne, 119 F.3d 637, 643 (8th Cir. 1997), the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest. United States v. Caves, 890 F.2d 87, 93 (8th Cir. 1989).

In determining whether probable cause exists, we recognize that the police possess specialized law enforcement experience and thus may "draw reasonable inferences of criminal activity from circumstances which the general public may find innocuous." Id. at 94 (citation and internal quotations omitted). Accordingly, we view the totality of the circumstances in Mendoza's case through the eyes of the

---

[1]The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Arthur J. Boylan, United States Magistrate Judge for the District of Minnesota.

experienced narcotics agents involved in his arrest.  See Payne, 119 F.3d at 643. Furthermore, we give "due weight" to inferences drawn from the facts and circumstances of each case by local law enforcement officers.  Id. at 642.

At the May 22 deal, a call from Holmes immediately after the price and amount of drugs had been negotiated heralded the arrival of a Hispanic courier, who brought the crack and took the buy money in exchange.  Given the larger magnitude of the June 5 deal, officers testified that their training and experience suggested that "somebody" would soon arrive to retrieve the money.  A government expert testified that such behavior was consistent with a person who sells drugs out of her home. This likelihood was further increased by the officers' discovery that Holmes had made or was in the process of making a phone call immediately after completing the deal with Porras.

The officers' suspicions were soon confirmed by the arrival of Mendoza and his passenger in the SUV.  By slowly approaching Holmes's residence twice and staring intently at the house each time, and by cautiously exiting the vehicle, Mendoza exhibited behavior which, based upon the surveillance officers' training and experience in past deals, indicated that he was "involved with what was going on at the residence."  In addition, like Holmes's description of her source and the May 22 runner, Mendoza was a Hispanic male.  Furthermore, by reentering the vehicle and speeding away after making eye contact with one of the undercover surveillance officers, Mendoza behaved in a manner suggesting that he had just "made" the surveillance officers and wished to leave as quickly as possible.  Given Mendoza's behavior, as well as their experience with the specific deals at issue here, the officers had ample probable cause to believe that Mendoza was connected to the drug deal and thus had committed a crime.  Accordingly, his warrantless arrest was proper, and the search of his person and seizure of his cellular phone were valid as a search incident to a lawful arrest.  United States v. Oakley, 153 F.3d 696, 698 (8th Cir. 1998).

**B.**

Mendoza next asserts that the evidence presented by the government was insufficient to convict him of any of the three counts of indictment. We review *de novo* the sufficiency of the evidence supporting a conviction, viewing it in the light most favorable to the verdict and upholding the verdict if, based upon all the evidence and all reasonable inferences in favor of the verdict, any reasonable juror could have found the defendant guilty beyond a reasonable doubt. United States v. Hill, 410 F.3d 468, 471 (8th Cir. 2005).

To convict Mendoza on count 1 of the indictment, the government was required to prove that: (1) a conspiracy existed through Mendoza's agreement with Holmes to distribute and possess with intent to distribute cocaine base; (2) Mendoza knew of the conspiracy and its ultimate goal; and (3) Mendoza knowingly joined and participated in the conspiracy. Id.; United States v. Munoz, 324 F.3d 987, 990 (8th Cir. 2003). The government was not obligated to present direct evidence of an explicit agreement, but rather could allow the jury to infer its existence from the circumstantial evidence. United States v. Rojas, 356 F.3d 876, 879 (8th Cir. 2004).

The evidence adduced at trial showed that Holmes contacted Mendoza seconds after the May 22 transaction with Porras was negotiated. Soon after that, a courier arrived to deliver the crack to Holmes and to collect the buy money. In addition, twenty minutes after Porras and Holmes agreed on the price and amount of the June 5 deal, Holmes contacted Mendoza again. When Porras arrived at Holmes's residence to consummate the deal an hour later, he found that the four ounces of crack were already there. Finally, after the June 5 deal had been completed, Holmes immediately contacted Mendoza. Mendoza then arrived at Holmes's residence five to ten minutes later, acted in a manner tending to show that he had something to do with the events at the residence, and was arrested. These facts, when viewed in the light most favorable to the verdict, give rise to the reasonable inference that Mendoza was Holmes's drug source for both the May 22 and June 5 transactions, that Mendoza

sent the courier to Holmes's residence on May 22, and that Mendoza's purpose for appearing at Holmes's residence on June 5 was to retrieve the deal money from that transaction. Accordingly, the jury's verdict on count 1 was supported by the evidence.

Similarly, the evidence sufficiently supports the jury's verdicts on counts 2 and 3 (aiding and abetting), which required the government to prove that: (1) Mendoza associated himself with the distribution of and possession with intent to distribute cocaine base; (2) he participated in these activities as things that he wished to bring about; and (3) he sought by his action to make them succeed. United States v. Wagner, 884 F.2d 1090, 1097 (8th Cir. 1989). This is especially true given the fact that the government was required to prove neither possession of cocaine by Mendoza nor an actual sale by him in order to impose liability on an aiding and abetting theory. United States v. Stuart, 923 F.2d 607, 611 (8th Cir. 1991).

The judgment is affirmed.

HEANEY, Circuit Judge, dissenting.

I find nothing in the record to support the majority's assertion that Mendoza's warrantless arrest was supported by probable cause. Thus, I respectfully dissent from that portion of the opinion.

Officers may only execute a warrantless arrest where the facts and circumstances would support "'a prudent person's belief that the suspect had committed or was committing a crime.'" United States v. Cabrera-Reynoso, 195 F.3d 1029, 1031 (8th Cir. 1999) (quoting United States v. Magness, 69 F.3d 872, 874 (8th Cir. 1995)). And while the majority is correct that we are to give "due weight" to the inferences drawn by experienced law enforcement officers, United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997), those inferences must still be reasonable, see

Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (recognizing that the latitude given to trained officers in making a probable cause determination is not without its limits).

Here, the government suggests that the officers properly suspected that Mendoza was Holmes's drug source. Given the evidence, this is simply not a reasonable deduction. The only identifying features proffered by the government for Holmes's drug source were: 1) that Holmes's source promptly delivered the drugs on bicycle during Porras's first undercover buy; and 2) Holmes's statement that her source was Hispanic. None of our cases support the warrantless arrest of a person based on such limited characteristics. In Cabrera-Reynoso, there was probable cause to believe that the defendant was connected to criminal activity because after numerous undercover drug buys, the defendant was positively linked to a known drug house; the government had strong evidence that the defendant had met with the drug seller prior to the undercover buys; and officers were given a detailed description of the defendant's vehicle. 195 F.3d at 1031-32. Thus, they had reason to believe that the defendant was a drug source. Id. at 1032. Similarly, in United States v. Adams, 346 F.3d 1165, 1169-70 (8th Cir. 2003), there was probable cause to arrest a defendant whose associate stated, against his own penal interest, that the defendant traded him drugs for guns. In United States v. Martin, 28 F.3d 742, 744-45 (8th Cir. 1994), the defendant matched the height, weight, race, and hair color of a robbery suspect, and his van had been linked to the crime.

In each of the above cases, some circumstance positively connected the suspect/defendant to the crime *to the exclusion of others*. Mendoza, on the other hand, was not singled out by any particular feature known to the officers prior to his arrest. As a matter of fact, the only distinguishing feature proffered by the government is the fact that Mendoza is Hispanic. Without a more accurate description of a person, the relevance of this characteristic is questionable at best; it certainly does not provide probable cause to believe that a Hispanic person in

Holmes's neighborhood was her drug source merely because she identified her source as Hispanic.

The majority suggests that we must give weight to the officers' expertise in believing that a drug source would arrive shortly after Porras's second transaction. I disagree. The officers' belief in this regard was not based on any specialized training, but on their observation of the first transaction when a source arrived to give Holmes the drugs. During that exchange, the source, admittedly a Hispanic male, rode to Holmes's house on a bicycle. I find it both disingenuous and troubling for the government to maintain that Mendoza met the description of the drug source because he was Hispanic, but ignore the fact that he arrived after the second drug deal in a vehicle rather than on a bike. This was not one of many transactions, such that officers had the opportunity to create a "track record" and thus form a reasonable belief of what may happen; rather, this was the second of two discrete drug deals. Such a short history does little to inform the officers about the signature of a source, if one exists, and the lack of any detailed corroboration further casts doubt on the reasonableness of the officers' suspicions of Mendoza.

The government argues that the officers' suspicions were properly aroused when Mendoza drove around the block twice before stopping at Holmes's house, surveyed the scene as he exited his sport utility vehicle, and then returned to his vehicle and left. Accepting this argument neglects our responsibility to consider evidence which tends to negate the possibility that a suspect committed a crime, which is also crucial to the probable cause inquiry. Adams, 346 F.3d at 1170. Mendoza introduced uncontradicted testimony that police operations, such as the one that was underway when Mendoza arrived, typically involve several officers and many police vehicles. Indeed, Holmes's sister testified that when she arrived at the house minutes after the officers entered, the street was so crowded that she was forced to park in the driveway. She testified that she saw a sport utility vehicle–presumably Mendoza's–circle the block, which she simply attributed to the dearth of street

parking. Moreover, Officer Porras himself testified that it is not uncommon for police operations such as the one at Holmes's house to attract attention and spectators. Given these circumstances, I find nothing particularly suspicious about Mendoza's act of circling the block and then exiting his vehicle for a short time before returning to it.

In sum, I find the officers' arrest of Mendoza to be unjustified. He matched only very general characteristics of the person that officers believed to be the drug source: he was Hispanic. Other circumstances, such as the fact that Mendoza arrived at the house in a sport utility vehicle, while the first source rode a bike, conflicted with the notion that he was the source. Moreover, I cannot agree that the government can establish a pattern of behavior for Holmes's source based on one past transaction. Lastly, given the fact that there was no parking and a large-scale police operation underway, Mendoza's act of driving around the block and looking at Holmes's house is understandable. The combination of these features may have been sufficient to support an investigative stop of Mendoza's vehicle, and that investigation may have yielded probable cause to believe Mendoza had committed or was committing a crime. See United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999) (noting that motor vehicles and their occupants are subject to investigative detentions when officers harbor a reasonable suspicion that the vehicle or its occupants are involved in criminal activity). That, however, is not what happened. The officers here immediately executed a warrantless arrest of Mendoza without probable cause to believe he was Holmes's drug source.

For the foregoing reasons, I respectfully dissent.

_____